CANTIERI NAVALI RIUNITI

v.

M/V SKYPTRON and Ultramar Egeo Corporation.

LAKE CHARLES STEVEDORES, INC. & Texas Marine & Industrial Supply Company, Inc.

v.

M/V SKYPTRON, Her Engines, Tackle, Apparel, etc., In Rem, and Ultramar Egeo Corporation and Kardaymlian Development Corp. S.A., In Personam.

Civ. A. Nos. 84–2494, 84–2666.

United States District Court, W.D. Louisiana, Lake Charles Division.

Oct. 4, 1985.

Scott J. Scofield, Edgar F. Barnett, Lake Charles, La., for plaintiff.

Hunter Lundy, Lake Charles, La., James O.M. Womack, Hervin A. Guidry, George R. Wentz, New Orleans, La., Dennis L. Doise, Lafayette, La., for defendants.

## MEMORANDUM RULING

EDWIN F. HUNTER, Jr., Senior District Judge.

### I. FACTS

This is an *in rem* admiralty proceeding in which numerous alleged creditors of the Greek-flag bulk carrier M/V SKYPTRON assert maritime liens against proceeds from the sale of that vessel. Several creditors have already been paid and have been dismissed from this action. Lucifer (Panama) S.A., the mortgagee of the vessel, has been paid $1.6 million of the $3 million realized from the sale but still claims an unpaid balance on its mortgage of more than $8.8 million. The remaining parties assert claims which total in excess of $700,-000. Ours is the task of juggling the interests of a Liberian vessel owner, a Greek registered vessel, a Panamanian mortgagee, a mortgage executed in Hong Kong and registered in Piraeus, an English bunkers supplier, an Indian ship chandler, a French Oil Company, an Italian shipyard, a Dutch bank, and a Greek union—all of whom naturally argue the applicability of the laws of the country which give their claim the greatest advantage. Let us, now, relate the story of the last few voyages of SKYPTRON.

On 5 May 1982, Lucifer (Panama) S.A. ("Lucifer") and Ultramar Egeo Corporation ("Ultra") entered into a "First Preferred Mortgage and Deed of Covenant" which granted a Greek First Preferred Mortgage upon the M/V SKYPTRON to Lucifer in return for a loan by Lucifer to Ultra of $8.52 million. The parties properly registered the mortgage in London and Piraeus, Greece. Ultra then engaged a Greek corporation, Kardemylian Development Corporation ("Kardy"), to manage and operate the vessel. The SKYPTRON traded without incident until 1983.

On or about 18 November 1983, SKYPTRON arrived in Annaba, Algeria to pick up cargo. She collided with a pier in Annaba's harbor tearing a twenty meter (sixty five and one half foot) hole in the port bow above the water line and puncturing the internal plates of a fuel tank and a ballast tank. The ship could not be loaded because the weight of the cargo would force the puncture several feet below the water line, thus filling the forward hold with water.

Even without cargo, the SKYPTRON had to be heavily trimmed with ballast, distributing the weight of the vessel to keep the hole as high above the water as possible. Thus trimmed, the ship limped to Palermo, Italy where an Italian Shipyard, Cantieri Navili Riuniti ("Cantieri") would perform repairs. Once the SKYPTRON arrived in Palermo, on 11 November 1983, Cantieri presented the SKYPTRON's master with a questionnaire and a form contract entitled "General Conditions of Shiprepair." The master signed both documents and affixed the vessel's stamp. Although the form contract had two signature lines, one for the yard and one for the master, only the master signed. Immediately upon execution of these documents and the obtaining of proper clearances from various harbor authorities, Cantieri began work on the vessel. After work had begun, Mr. Birsimitzoglou, the "owner's representative" (actually an employee of Kardy) arrived in Palermo and signed a "work order." Repair charges for the SKYPTRON totalled $83,000, of which Kardy has paid only $12,000.

The next significant port of call in the saga of the SKYPTRON was Lake Charles, Louisiana, where the vessel took on lubricants on 13 January 1984. Kardy contacted the Paris office of Societe des Lubrifiant Elf Aquitaine (SLEA), a subsidiary of ELF, the French oil conglomerate, and requested that the company deliver lubricants to the vessel in Lake Charles. SLEA contacted Ocean Oil, another subsidiary of Elf which is headquartered in London. Ocean Oil, in turn, contacted its agent in New York, Hudson Lubricants. Then, Hudson Lubricants contacted its correspondent in Lake

Charles, Delta Petroleum Company. Delta Petroleum supplied the lubricants to the vessel and obtained a receipt from the master. Delta Petroleum then invoiced Elf Marine London International Service, another subsidiary of Elf and a sister corporation to Ocean Oil. Elf Marine London paid the invoice of Delta Petroleum and paid Hudson Lubricants a commission. Elf Marine London then invoiced SLEA in Paris. SLEA reimbursed Elf Marine London, and, in turn, invoiced Kardy. Kardy has not paid the $5,452.44 invoice.

In early April of 1984, the SKYPTRON arrived in Port Said, Egypt, at the northern mouth of the Suez Canal. There, SLEA arranged for Societe Cooperative des Petrole ("Copetroles") to supply the vessel with various lubricants. On April 4, the SKYPTRON filled out a "Master's Requisition for Coop Marine Lubricants" signed by the Master and the Chief Engineer, as well as marked with the vessel's stamp. In accordance with the requisition, the supplier delivered the lubricants and sent an invoice to SLEA who, in turn, invoiced Kardy for $16,247.96. Kardy never paid the invoice.

On 20 July 1984, the SKYPTRON sailed into the harbor of Madras, India, to load Barite. Barite, an ore composed mainly of Barium Sulfite, is an important ingredient of drilling mud. During loading operations, the master obtained "indents" from the ship's Chief Steward and Chief Engineer. These indents were requisition lists for food and other supplies for the crew as well as hardware for the ship. The master then went to the place of business of Savoy Marine ("Savoy") and requested that Savoy supply to the SKYPTRON the stores contained in the lists. Savoy made its price catalog available for the master's inspection and agreed to supply the items.

The next day, Savoy delivered to the SKYPTRON the items listed in its delivery receipts (Savoy Marine Exhibits 6–10). The master signed the delivery receipts and affixed the vessel's stamp; Savoy Marine also signed the receipts. Loaded with Barite, the SKYPTRON sailed on 21 July 1984,

having paid none of the $9,395.45 due for supplies. Although presented with the receipts for payment, Kardy has yet to pay for the supplies.

Before the SKYPTRON arrived in Madras, Kardy contacted Nick Mavridoglou of Redwood Bunkering ("Redwood") to arrange for refueling the SKYPTRON. Mavridoglou, in turn, got in touch with Tramp Oil & Marine, Ltd. ("Tramp") to supply fuel to the vessel in Madras. However, Tramp was called later and advised that the SKYPTRON would not need refueling until it reached Colombo, Sri Lanka (Ceylon). When the vessel reached Colombo, it presented a Bunkers Requisition Form, signed by the vessel and marked with the vessel's stamp, to Ceylon Petroleum Corporation, Tramp's Colombo supplier.

In accordance with the request, on 28 July 1984, Ceylon Petroleum supplied the fuel and presented the SKYPTON with two signed receipts (one for diesel fuel and one for furnace oil). The chief engineer of the SKYPTRON signed them both and affixed the vessel's stamp. As the sale was a credit transaction, the SKYPTRON sailed without paying for the fuel. Later, Ceylon Petroleum billed Tramp Oil for the fuel, and Tramp paid the bill. Tramp then mailed an invoice to Redwood who forwarded it to Kardy. The $72,118.57 invoice has remained unpaid.

The SKYPTRON then set sail for the U.S. Gulf coast *via* the Suez Canal. While the ship was *en route* toward the Suez, Kardy advised Redwood that the SKYPTRON would urgently need to take on fuel once it reached Port Suez, Egypt. Redwood quoted a price to Kardy and contacted its local supplier, Copetroles, which actually supplied the fuel. Upon the ship's arrival in Port Suez, on 8 August 1984, the SKYPTRON filled out and signed a "Masters Requisition for Oil Bunkers" and stamped it with the vessel's mark. Later that day, when Copetroles had finished fueling the vessel, it presented the vessel with a signed receipt for the fuel. Someone on board signed the receipt and affixed the vessel's stamp. Copetroles then

presented Redwood with an invoice for the fuel which Redwood paid. Later, Redwood sent an invoice to Kardy for $122,064.89 which has not been paid. From Port Suez the SKYPTRON sailed to Lake Charles where, on 16 September 1984, it was seized on the complaint of Cantieri.

## II. PROCEDURAL CONTEXT

On 15 November 1985, the vessel was sold under a writ of *Venditioni Exponas* for $3,000,000 to Bonfair Steamship Co. After the seizure, Lake City Stevedores ("Stevedores") filed a complaint; that proceeding was later consolidated with the one initiated by Cantieri. Stevedores has been paid and, except for their claim for attorney's fees, dismissed from the action. Lake Charles Harbor and Terminal District then intervened to move that the SKYP-TRON be unloaded and moved to a long-term berth. Both the intervention and the motion were granted and the District is no longer a party to this action.

The next intervenor is Algemene Bank Nederland N.V. Greece ("Algemene"). In July and August of 1983, Algemene's Pireaus branch allowed Kardy to overdraw its account with them based on Kardy's promise to repay the overdrafts at an early date. When by late August no payment was forthcoming, Algemene secured its loan by procuring from Kardy an assignment of freight payments pursuant to Kardy's charter of the SKYPTRON to Islamic Republic of Iran Shipping Lines. Despite prodigious correspondence between Algemene and Kardy and despite Algemene's allowing Kardy to pay the debt in installments, the entirety of the debt remains unpaid. Alegemene claims that the extention of credit is an advance which gives rise to a maritime lien on the SKYPTRON and, in its intervention, asserts a lien in the amount of $307,992 plus attorney's fees.

Next, the members of the crew of the SKYPTRON intervened for their wages and for attorney's fees. They have been paid and dismissed from the action. Soon after this intervention was filed, this Court ordered an interlocutory sale of the SKYP-TRON. Pursuant to that order, Sabine Surveyors estimated the value of the vessel to be $2,250,000. It was later sold to Bonfair for $3 million.

Next, Tramp intervened to recover $72,110.57 for fuel supplied in Colombo plus interest. The mortgagee of the vessel, Lucifer, also intervened seeking payment against the $8,824,015.40 outstanding debt, in priority over all other claimants. The Master of the SKYPTRON, Marcelos Kreutsoulas, filed the next intervention for his back wages, expenses and attorney's fees. He has been paid and dismissed from this action.

Also intervening is Redwood Bunkering, seeking $122,064.89 plus interest and attorney's fees as a result of its providing fuel to the SKYPTRON in Port Suez, Egypt on 12 August 1984. The Greek Seamen's Pension Fund ("N.A.T.") also intervenes in this matter, seeking $87,000 in fees and deductions from crew wages which Greek statutes require the ship owner to pay to the fund.

NL Industries, Inc. ("NL"), through its NL Baroid Division, filed the next intervention. NL claims that the "precarious financial condition" of the SKYPTRON rendered her unseaworthy, and that the seizure of the vessel in Lake Charles which prevented the vessel from unloading part of its cargo in Houston caused NL to incur $112,087.72 in damages from lost profits, unloading charges, discharge fees, and damage to its business reputation. NL claims that the above circumstances give rise to a maritime lien on the vessel. Red Sea Bunker supplies also intervened but their intervention has been dismissed on their own motion. Claiming a maritime lien for supplies provided to the SKYPTRON in Madras, India, Savoy Marine has also intervened in this litigation seeking $9,395.45 plus interest.

SLEA also intervenes. This intervention asserts a maritime lien on the SKYPTRON resulting from its 13 January 1984 delivery of $5,452.44 worth of lubricants to the ship in Lake Charles and its 4 April 1984 delivery of $16,247.96 worth of lubricants to the

ship in Port Said[1] for a total of $21,710.50. The intervention also asserts claims *in personam* against Ultra and Kardy for that same amount as well as for $47,250.49 resulting from fuel and supplies furnished by SLEA to other ships owned by Ultra and managed by Kardy. However, for several reasons, the *in personam* claims are not properly before this Court.

■ A fundamental tenet of Due Process is that a party must be served with process or must "appear" before the court before that court has jurisdiction to render a judgment against him. Although Cantieri and some of the intervenors name Kardy and Ultra as defendants, we can find nothing in the record to indicate that either was served or has made an appearance. Moreover, neither of them is represented in this matter. Therefore, neither Ultra nor Kardy is a party to this action and this Court has no jurisdiction to render a judgment against them.

■ Furthermore, SLEA's intervention was not sufficient to join Kardy and Ultra to the action. Intervention is designed to allow a person not a party to the action to assert claims against those who are already parties or against some *res* subject to the jurisdiction of the court. It is not a mechanism for joining persons who are not parties to the litigation. Fed.R.Civ.P. 24; C. Wright, *Law of Federal Courts* § 75 (2d ed. 1970).

Additionally, on 20 November 1984, we ordered that no claims be asserted against the Skyptron fund or any defendants in this matter after 30 November 1984. On 29 April 1985, in derogation of that order, we granted SLEA's motion to intervene. Considering the lateness of the motion and in view of its being filed pursuant to an order granting leave to intervene only, we are not disposed toward giving a pleading styled as a Rule 24(b) intervention the effect of a Rule 19 joinder.

Moreover, Rule 24 under which this intervention is brought, gives to this Court broad discretion in deciding whether to grant the intervention. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452 (5th Cir.1984); *Sellers v. United States,* 709 F.2d 1469 (11th Cir. 1983); *Montgomery v. Rumsfeld,* 572 F.2d 250 (9th Cir.1978). Logically, this discretion should be broad enough to allow this Court to grant that part of an intervention that actually is an intervention and to dismiss that part which is not. Accordingly, that part of SLEA's intervention which asserts claims *in personam* against Kardy and Ultra as well as any such claims by plaintiffs or any intervenor are DISMISSED WITHOUT PREJUDICE. Naturally, SLEA's *in rem* claims are properly before us, and we will rule on them later in this opinion.

■ However, we will not allow SLEA to assert against the SKYPTRON fund claims arising out of its transactions with other vessels. To so allow would violate the basic tenet of maritime law that a maritime lien against a vessel arises only out of the acts of that vessel and no other. *See* F. Maraist, *Admiralty* 94–95 (1983).

Next, in its answer to Lucifer's intervention, Cantieri counterclaimed against Lucifer. Cantieri asserts that Lucifer was a participant in a scheme whereby the SKYPTRON would incur expenses for necessaries and repairs but would avoid paying for them. Under the scheme, Kardy would abandon the ship when seized for its debts, then Lucifer would assert its mortgage on the vessel to defeat many of the liens. In the counterclaim, Cantieri demands $73,171.00 plus interest, costs, and attorney's fees. Red Sea Bunker and Savoy Marine also answer Lucifer's intervention and crossclaim on identical grounds. Red Sea is no longer a party to this suit; Savoy

---

**1.** Intervenor's Petition in Intervention alleges the Lake Charles delivery to have occurred on 23 January 1983 and to have been in the amount of $5,245.44 and alleges the April delivery to have taken place on the 19th in Lake Charles for $16,247.98, in clear contradiction to intervenor's own exhibits. We read the Petition to conform to the exhibits. *See* Fed.R.Civ.P. 8(e).

claims damages of $9,395.45 plus interest, costs and attorney's fees.

On 29 April 1985, pursuant to Lucifer's Motion to Return Funds Not in Dispute, we ordered that $1,400,000 of the SKYPTRON fund be kept in the registry of the Court and that the rest be paid to Lucifer, the mortgagee.

Next, Redwood and Tramp filed cross-claims against Lucifer and Orient Leasing Company, the parent company of Lucifer. Each of these very similar cross-claims asserts three causes of action. The first cause of action asserts against Lucifer and Orient the debt claimed in those parties' original intervention against the SKYP-TRON fund. This claim is based on Lucifer's mortgage on the SKYPTRON which gives it all of the powers of ownership. And, as *de facto* owners, Lucifer and Orient are allegedly liable for the debts of the Skyptron. The second cause of action prays that the mortgage to Lucifer be judged null and void because Lucifer, Kardy, Ultra, and Orient are all pieces of the same corporate puzzle and, therefore cannot execute valid ship mortgages to one another. The third cause of action asserts that Lucifer and "a myriad of corporations, actively and intentionally participated in a scheme during the SKYPTRON's final two voyages whereby the defendants ... incurred numerous debts for necessaries ... with no intent to pay for these necessaries."

The counterclaims further assert that, when the SKYPTRON was arrested in Lake Charles, the "owners" abandoned the vessel knowing that another Ocean Leasing subsidiary would purchase it at auction and that Lucifer could recapture the proceeds of the sale for the Orient group by asserting its mortgage and defeating the other liens. These events, Redwood and Tramp claim, constitute a scheme to defraud them of payment for the supplies which they furnished to the vessel. They pray for payment for the supplies. Algemene also files a similar crossclaim, founded on three almost identical causes of action. And, apparently hopping on the same judicial band-wagon, SLEA also crossclaims against Lucifer and Orient, claiming damage in the amount of $21,502.42 under three causes of action copied almost verbatim from Redwood and Tramp's petitions. We granted the motion to intervene against Lucifer but denied it as to Orient.

Savoy then moved to amend its earlier crossclaim to add Orient as a defendant *in personam* and to assert against both Lucifer and Orient claims based on the now very popular three causes of action. Savoy still seeks payment of the $9,395.45 debt asserted in its first intervention as well as interest, costs, and attorney's fees. We granted the motion as to Lucifer but did not allow Savoy to add Orient as a defendant.

Cantieri then amended its complaint, supplying particulars concerning the SKYP-TRON's accident in Nigeria and changing the amount of its demand from $73,171.00 to $71,000.00 (plus costs and attorney's fees). Cantieri also moved to amend its crossclaim to add Orient and Kardy as crossclaim defendants and to add two very familiar causes of action, one asserting that Kardy and Orient are liable *in personam* for the debts of the SKYPTRON because the ship's mortgage made them *de facto* owners of the vessel, and another asserting that the mortgage is a simulation. We now grant that motion as to Kardy, but deny it as to Orient.

Next, pursuant to a motion by Lucifer, we recalled our order allowing Redwood and Tramp to file crossclaims against Orient and have dismissed the crossclaims against Orient. However, we have retained Redwood's and Tramp's crossclaims against Lucifer. Lucifer responds to these crossclaims by admitting to the existence of the mortgage on the SKYPTRON but denies that there was any scheme to avoid payment and asserts that all claims must be against the funds in the registry of the Court and not against Lucifer *in personam*. As neither Lucifer nor Ultra has any assets to speak of, we will consider only those claims against the proceeds of the

sale and will render judgment only against these funds.

## III.  LAW AND DECISION

### A.  Choice of Law

Before this court can determine the rights of the claimants to the SKYPTRON fund, we must decide under what law that determination must be made.  Lucifer urges that the law of the United States, i.e., Title 46 of the United States Code, should supply the rule of decision.  On the other hand, the majority of the intervenors assert that most of the claims are governed by the International Convention for the Unification of Certain Rules Relating to Maritime Liens and Mortgages, L.N.T.S. 2765, signed in Brussels in 1926 ("Brussels Convention"), as that document has been interpreted by Greek courts.

There are strong policy reasons for adopting Lucifer's view.  Although counsel have deposed two experts on Greek law and the ranking of liens under the Brussels Convention and have supplied us with English translations of Greek court decisions which interpret the Convention, we are still better equipped to apply U.S. law.  The law of this country is not only more accessible to us, but also to counsel who must argue the law to this Court.  Lucifer has cited to us several cases which support application of U.S. law in this case.  *Harrison v. Sterry*, 9 U.S. (5 Cranch) 289, 3 L.Ed. 104 (1809) (United States law governs the distribution of a foreign bankrupt's assets in the U.S.); *The Scotia*, 35 F. 907 (S.D.N.Y.1888) (The law of the forum, rather than the law of the vessel's flag, governs maritime liens asserted in United States Court.); *The Scotland*, 105 U.S. 24, 15 Otto 24, 26 L.Ed. 1001 (1881) (Law of the forum applies in maritime cases in most instances.); *Brandon v. S/S Denton*, 302 F.2d 404 (5th Cir. 1962) (Priority of maritime liens asserted in Federal Court is determined by 46 U.S.C. § 911 *et seq.*, even as to foreign ship mortgages.).

■  We therefore hold that the law of the United States governs this lawsuit.

However, U.S. law allows parties to alter by agreement the priority of liens established by law.  *W.A. Marshall & Co. v. The President Arthur*, 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846 (1929); 46 U.S.C. ¶ 974.  They may do so "by agreement or otherwise."  46 U.S.C. ¶ 974.  Many of the intervenors argue that Lucifer has waived the priority of its mortgage as to certain other liens.  They base their arguments on an in court stipulation and on a provision of Lucifer's Greek Preferred Ship Mortgage on the SKYPTRON.

On 10 June 1985, we heard evidence and argument on this case and took the case under advisement leaving evidence open.  The minutes of those proceedings, under the heading "Verdict, Ruling, Comments," contain the following language "19).  It was stipulated by counsel and the court that the Brussels Convention in 1926 [sic] applies to the ranking of the liens and further stipulated that it applies to every claim except to Algemene Bank, Nederland and lost profits, etc. of N.L. Industries."  Counsel for many of the intervenors strenuously assert in Post-Trial Memoranda that this stipulation binds Lucifer to the Brussels Convention.  Lucifer asserts with equal vigor that the stipulation is "limited to the question of whether the Brussels Convention is applicable to Greek law, and the stipulation does not concern the question of whether Greek law is applicable to the ranking of liens in this forum."  Letter by James Womack, counsel for Lucifer, to Judge E.F. Hunter, Jr., distributed to all counsel of record, August 28, 1985.  To the extent that the stipulation would require us to apply the Brussels Convention to the ranking of the liens, Mr. Womack has asked to be allowed to withdraw from it.

■  Although the plain words of the record do not allow us to give to the stipulation the interpretation urged on us by Lucifer, we are not disposed to hold a party to an oral stipulation by counsel which counsel later finds to be prejudicial to his client.  Accordingly, we shall disregard the stipulation.  *Loftin and Woodard, Inc. v.*

*United States,* 577 F.2d 1206, 1232 (5th Cir.1978).

■ A stronger argument for application of the Convention's ranking scheme is derived from Lucifer's mortgage. The mortgage (Lucifer's own exhibit) unambiguously states that the owner "assigns to the mortgagee [Lucifer] all of the Owner's rights deriving from legislative decree 2687/1953 as authentically interpreted by legislative decree 2928/1954 and from Ministerial Decision Number 54259/80...." Lucifer Exhibit # 3, at 9. Ministerial Decision 54259/80 is the Greek government's approval of the renaming of the M/V DE-LORES de PANDOLIT as the M/V SKYP-TRON and of the mortgage of the vessel to Lucifer. Paragraph 19 of the Decision, in certified translation from the Greek, states that "[T]he mortgage will precede all the maritime and other liens ... *except only of the liens stated in article 2 of the Brussels Convention of 1926.*" (emphasis supplied). Therefore, Lucifer has agreed that those liens described in Article 2 of the Convention will prime its mortgage on the SKYPTRON and, accordingly, we are persuaded that all claims which fall under the ambit of Article 2 will in fact prime Lucifer's mortgage.[2]

■ Having made the decision to apply Article 2, we must decide under the law of what nation we will interpret its terms. Lucifer's mortgage supplies the answer. It provides:

> 18. *THESE* presents shall so far as regards the question of their due registration and rights of property in and over the Vessel be governed and construed according to the laws of the Republic of Greece but without prejudice to and so far as consistent with the foregoing all questions as to the rights or property in the Earnings and Requisition Compensation and the Insurances and the interpretation and effect of all other the terms conditions covenants stipulations and representations in these presents con-

> tained shall be governed and construed in accordance with the laws of England....

As the provision incorporating the Convention governs Lucifer's "rights of property in the vessel," it is to be "governed and construed according to the laws of the Republic of Greece."

### B. Ranking of Liens Under the Convention

Article 2 lists five classes of liens which will prime a preferred ship mortgage, two of which are relevant to this litigation:

> 2. Claims arising out of the contract of engagement of the master, crew, and other persons hired on board;
>
> ....
>
> 5. Claims resulting from contracts entered into or acts done by the master, acting within the scope of his authority away from the vessel's home port, where such contracts of [sic] acts are necessary for the preservation of the vessel or the continuation of its voyage, whether the vessel master is or is not at the same time owner of the vessel, and whether the claim is his own or that of shipchandlers, repairers, lenders, or other contractual creditors.

■ Most of the liens are asserted under the provisions of Article 2, ¶ 5 of the Convention. A ¶ 5 lien must meet the following criteria:

1. It must result from contracts entered into or acts
2. By the Master
3. Acting within the scope of his authority
4. Away from the vessel's home port
5. Where such contracts or acts are necessary
   a. for the preservation of the vessel, or
   b. for the continuation of the voyage.

---

**2.** So that we need not re-try this case should the Court of Appeals reverse on this point, we shall discuss below how we would rank the liens if

we were not to give effect to the Brussels Convention.

Any lien which satisfies all five of these criteria or which arises out of the contract of employment of ships personnel (a ¶ 2 lien) will prime Lucifer's Greek Preferred Ship Mortgage.

### 1. *Cantieri's Claim*

Cantieri asserts a ¶ 5 lien as a result of the repairs which it performed on the SKYPTRON. Lucifer strenuously resists this assertion, claiming that the repairs were not performed under a contract with the master and that they were not necessary either for the preservation of the vessel or for the continuation of the voyage.

Lucifer's contractual argument is that Greek law requires the signatures of both parties to a contract for that contract to be enforceable. Since there is no document or interlocking pair of documents bearing the signature of the master and of Cantieri, Lucifer argues that there is no contract between the yard and the master and, therefore, no ¶ 5 lien on the SKYPTRON. Instead, Lucifer claims that the true contract is between Kardy and Cantieri and that all arrangements between Cantieri and the master were made in anticipation of the arrival of a representative from Kardy who would conclude a formal agreement with Cantieri.

However, the deposition of Georgio Rizzo, a Naval Architect with Cantieri, indicates that Cantieri began work immediately upon receiving the master's signature and the vessel's stamp on a document entitled "General Conditions of Shiprepair" and that it did not wait for Kardy's approval or for the arrival of its representative. These facts would seem to give rise to a contract between Cantieri and the master under the familiar doctrine of "Acceptance by Performance," provided that we hold that doctrine to be applicable under Greek law. And, under these facts and a well-marked line of Fifth Circuit jurisprudence extending back for twenty years, it is the clear duty of this Court to so hold.

█ Although the parties have deposed two experts on the subject of Greek law, neither deposition contains any discussion of the doctrine of acceptance by performance. No party bothered to ask Mr. Sarlis or Mr. Fotopoulas whether a contract could be so accepted and neither of these gentlemen volunteered an answer. We do not know the answer. We are persuaded that when required to apply foreign law, and when the content of that law has not been proven, we should apply the law of the forum. *Seguros Tepeyac, S.A., Compania Mexicana v. Bostrom,* 347 F.2d 168, 174 n. 3 (5th Cir.1965). This result may be accomplished by presuming that the law of other jurisdiction is similar, or by applying discretion in the interest of just adjudication, a discretion which "should be especially broad in a state with a civil law background." 347 F.2d at 174 n. 3. The Fifth Circuit has consistently allowed trial courts to apply the law of the forum when required to apply inadequately proved foreign law. *Symonette Shipyards v. Clark,* 365 F.2d 464, 468 n. 5 (5th Cir.1966); *Gray v. Martindale Lumber Co.,* 515 F.2d 1218, 1220 (5th Cir.1975). We look to Louisiana law to fill this gap in the parties' proof of Greek law.

█ Louisiana specifically allows acceptance by performance. Article 1939 of the Louisiana Civil Code, derived from Article 1816 of the Louisiana Civil Code of 1870 and Article 1327 of the Italian Civil Code, provides:

> When an offeror invites an offeree to accept by performance and, according to usage or the nature or the terms of the contract, it is contemplated that the performance will be completed if commenced, a contract is formed when the offeree begins the requested performance.

The Louisiana jurisprudence is clearly to the effect that a written offer looking toward a construction contract may be accepted by the contractor's beginning work under the contract, particularly when the offeror promptly learns that work has begun. *Burk v. Livingston Parish School Bd.,* 190 La. 504, 182 So. 656 (1938), *Ever-Tite Roofing Corp. v. Green,* 83 So.2d 449 (La.App. 2d Cir.1955). Accordingly, we

hold that the General Conditions of Shiprepair document signed by the master of the vessel was an offer which Cantieri accepted by beginning the work.

Our conclusion that this interpretation best explains the legal relationship between the shipowners and Cantieri is underscored by the complete absence of Cantieri's signature on *ANY* of the documents in the record relating to the repair of the SKYPTRON. Obviously, Cantieri intended to accept by performance.

■ Lucifer also argues that no ¶ 5 lien arises because the repairs were not necessary for the continuation of the voyage or preservation of the vessel. This assertion is in obvious conflict with clear facts established by the record. Georgio Rizzo, the only naval engineer whose deposition is before us, stated that the vessel could only sail if heavily ballasted and could not safely take on cargo. The SKYPTRON is a cargo vessel and, as such, useless if it cannot carry cargo. Moreover, the master represented to the shipyard that the repairs were urgently needed to enable the ship to return to Annaba, pick up its cargo, and continue its voyage. The repairs were necessary to enable the vessel to continue its voyage; they give rise to a ¶ 5 lien in favor of Cantieri. Cantieri's lien shall be paid in preference to Lucifer's mortgage.

### 2. *SLEA's Claims*

SLEA claims liens under Greek law arising out of two transactions, the first in Lake Charles in January of 1984 and the second in Suez in August of 1984. In each instance, SLEA was contacted by Kardemylian and requested to arrange for delivery of lubricants to the SKYPTRON (in Lake Charles and in the Suez). After going through a series of intermediate companies and brokers, the supplies were delivered by local suppliers. In the case of the SLEA transactions, there is no request form from the master, but merely a receipt acknowledging delivery of the goods. The actual suppliers have been paid, as well as the intermediaries, and SLEA has been unable to collect on its invoices from Kardy.

Lucifer claims that the presence of intermediaries between SLEA and the vessel and the prior communications between SLEA and Kardy compel the conclusion that there is no contract between SLEA and the master. Naturally, if there is no contract between master and the person asserting the lien, no lien arises.

■ The two experts on Greek law whose depositions are before us are not particularly clear and, to the extent that they are clear, they appear to be in conflict. However, we are persuaded by Mr. Sarlis' testimony to the effect that under these circumstances, the master's contract is with the immediate supplier and not with SLEA. And, it is clear that Delta Petroleum and Copetroles, the immediate suppliers, have been paid. However, in both cases, it was SLEA which ultimately "picked up the tab." We therefore conclude that SLEA should be paid because they step into the shoes of Delta and Copetroles under the doctrine of Legal Subrogation.

We have no evidence before us concerning the existence *vel non* of Legal Subrogation under Greek Law. Therefore, we apply the Louisiana law of subrogation. Article 1829 of the Louisiana Civil Code provides: "Subrogation takes place by operation of law: (1) In favor of an obligee who pays another obligee whose right is preferred to his because of a privilege, pledge, or mortgage,...." The Lubricants and bunkers were supplied by Delta and Copetroles under a contract with the master and were necessary for continuation of the voyage. All the other requirements of ¶ 5 have been filled. Delta and Copetroles had a ¶ 5 lien on the SKYPTRON giving them a "privilege, pledge, or mortgage" under Article 1829. As the suppliers and, in turn, each intermediary was paid, the payor was subrogated to all of the suppliers' rights, including the ¶ 5 lien. La.Civ. Code Art. 1826. By making the last payment, SLEA now holds the liens on the SKYPTRON fund which originally arose in favor of Delta and Copetroles.

We conclude that SLEA has a ¶ 5 lien on the SKYPTRON fund for lubricants supplied in Lake Charles and bunkers supplied in Port Suez and that its lien shall be paid in preference to Lucifer's mortgage.

### 3. *Savoy's Claim*

Savoy Marine claims a ¶ 5 lien resulting from its sale of supplies to the SKYPTRON on 21 July 1984 in Madras, India. Lucifer asserts that no lien arose because Savoy's contract was with Kardy and not with the master. We do not agree.

■ Mr. Ramakrishnan, the owner of Savoy Marine, testified by deposition that the master contacted him directly with what amounted to a written requisition for supplies for the vessel. Savoy filled the requisitions and received receipts which were signed by the master and by Savoy. The requisition was an offer, accepted by loading the supplies.

■ Lucifer also asserts that no contract was consummated because the master stamped several of the receipts "PRICES SUBJECT OWNERS APPROVAL." Lucifer interprets this phrase to mean that there was no agreement between the master and Savoy as to price and that "any questions by the owners of the prices would be negotiated with the owners...." The deposition of Mr. Ramakrishnan tells a quite different story:

Q. In respect of Exhibits 1, 2, 3, 4 and 5—Invoices—were the rates agreed between you and the Master

A. Yes.

Q. These 5 exhibits contain a rubber stamp "prices subject owners approval." What is the meaning of it?

A. We have our price list circulated to all the owners which is accepted by the owners and the master

Q. So it means only verification?

A. During settlement the owners tally the price list and invoices

Deposition of R. Ramakrishnan at 3–4.

Q. Were the prices charged by you are in accordance with your catalogue?

A. Yes. Prices in respect of supplies made by us are in accordance with our catalogue. There is no other catalogue in respect of other supplies

Q. Do you have a copy of your catalogue?

A. Yes, I have

Q. Can you produce it?

A. Yes, I can.

Q. When orders are placed on you for the supply of provisions was the prices agreed to?

A. Yes agreed by the owners

Q. Do you have the owners agreement in writing?

A. It is only the Master confirms that owners have agreed

Q. If that is so why did the master endorse "prices subject—owners approval" in exhibits 1, 2, 4 & 5

A. It is intended for verification by the accounts department of the owners with our catalogue

*Id.,* at 10–11

■ Apparently, the master agreed to the prices in Savoy's catalog and only conformity between catalog prices and invoice prices as well as the tallying of the total price were subject to approval. We find that there was an agreement as to price in every important respect. This created a contract between Savoy and the master. Savoy Marine has a ¶ 5 lien on the SKYPTRON which is to be paid in preference to Lucifer's mortgage.

### 4. *Tramp's Claim*

Tramp Oil and Marine assert a ¶ 5 lien resulting from its arranging for the SKYPTRON to be supplied with diesel fuel and furnace oil. Ceylon Petroleum was the actual supplier. Tramp has paid Ceylon and now seeks payment from the SKYPTRON fund.

Lucifer argues that the only contract in this transaction was between Kardy and Redwood, the company which engaged Tramp to supply the bunkers. Kardy and

Redwood agreed on the price of the bunkers and the invoice signed by the master contained no price term. Price is an essential element of a contract under Greek law, as it is under all civilian systems. Absent a price term, Lucifer claims that there can be no contract between the master and the supplier.

■ A contract did exist between Kardy and Redwood, but a contract existed, too, between the master and Ceylon Petroleum, the actual supplier. The form, after listing the quantities and types of fuel requested, states "Please charge for same at the price and in the manner agreed upon by my Owners ... and your goodselves [sic]...." This form, signed by the master, does contain a price term by incorporating by reference the price agreed upon between Kardy and Redwood. Under Louisiana law (Greek law on this point not having been proven) a contract need not state a price as long as it indicates a meeting of the minds as to price. *Benglis Sash & Door Co. v. Leonards*, 387 So.2d 1171, 1173 (La.1980) (implied agreement to pay "reasonable price" supplied an adequate price term). Here, the parties agreed that the price charged would be the one agreed to by Kardy and Redwood. Therefore, the signed request contained all the requisite elements of an offer which Ceylon accepted when it supplied the fuel, giving rise to a ¶ 5 lien. Tramp was subrogated to that lien when it paid Ceylon's invoice and is entitled to have its lien paid in preference to Lucifer's mortgage.

### 5. *Redwood's Claim*

Redwood Bunkering's claim is based on almost identical facts to that of Tramp, except that there is one less intermediary between the master and the claimant. Accordingly, we hold that Redwood holds a ¶ 5 lien to be paid in preference to Lucifer's mortgage.

### 6. *Algemene's Claim*

■ Algemene Bank Nederland allowed Kardy to overdraw its checking account (in effect, a loan) and secured its repayment by obtaining an assignment of freights resulting from a charter of the SKYPTRON. Algemene claims that these circumstances give rise to a lien on the SKYPTRON which should be paid in preference to Lucifer's mortgage.

Algemene fails to convince us that its transactions with Kardy created any kind of maritime lien. Algemene's extention of overdraft facilities constituted a loan to Kardy, a corporation which manages several vessels, and Kardy did not grant any security device on the vessel. However, Algemene demanded and did receive an assignment of freights from the SKYPTRON resulting from a single charter party. Kardy never paid Algemene but transferred the proceeds of the charter to another account.

Neither does Algemene suggest nor can we find any reading of Article 2 of the Brussels Convention under which the Bank would have a lien on the SKYPTRON which would prime Lucifer's mortgage. However, it should be recalled that we are applying the provisions of the Convention pursuant to Lucifer's mortgage agreement. It is still possible for United States law to create a lien which would prime Lucifer's mortgage, even if the Convention is applied to other claims. We defer consideration of this issue to our later consideration of U.S. law, but we here hold that Algemene's claim does not fall within Article 2 of the Convention.

### 7. *NL's Claim*

■ N.L. Industries claims that, because of its precarious financial condition, the SKYPTRON was unseaworthy. By tortiously furnishing an unseaworthy vessel, NL argues that the vessel is liable to it *in rem* for damages it received because of the seizure. NL's cause of action is founded upon its inability to deliver barite to a drilling mud manufacturer as contracted. Suffice it to say at this juncture that such a claim creates no Article 2 lien and that the merits of NL's claim under U.S. law will be discussed below.

### 8. N.A.T.'s Claim

■ N.A.T., the Greek Seamen's Pension Fund, claims that it has a claim under ¶ 2 of Article 2 of the Convention for contributions to the fund which Greek law requires to be made in proportion to wages of the crew. N.A.T. claims that this obligation "arises out of the contract of engagement of the ... crew." However, Mr. Sarlis' testimony is to the effect that Greek law does not accord N.A.T. claims for contributions the status of a ¶ 2 lien. In fact, he claims that the matter is so well settled that N.A.T. doesn't even bother to sue under ¶ 2 in the Greek courts. Accordingly, we now hold that N.A.T.'s claim does not give rise to an Article 2 lien. We will later consider the merits of this claim under U.S. law.

### C. Ranking of Liens Under U.S. Law

The second paragraph of 46 U.S.C. § 951 provides for recognition of foreign ship mortgages provided that the mortgage is validly executed according to the laws of the flag state and registered in accordance with those laws either at the port of registry or at a central office. Such a mortgage is called a "preferred mortgage lien" and, in the case of a foreign vessel, is "subordinate to maritime liens for repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, performed or supplied in the U.S." This mortgage will also be subordinate to "a lien for damages arising out of tort, [or] ... for wages of the crew of the vessel...." 46 U.S.C. § 953(a)(2).

### 1. Validity and Rank of Lucifer's Mortgage

No party to this lawsuit claims that Lucifer's mortgage does not meet these statutory requirements. Nevertheless, many of the intervenors claim that we should declare the mortgage invalid or pay all other lienholders in preference to Lucifer. They advance two major arguments in support of these claims.

### a. No "Stranger to the Vessel"

It is well-settled law that a vessel owner, part owner, or joint venturer cannot hold a maritime lien on the vessel in which he enjoys such an interest. See G. Gilmore & C. Black, The Law of Admiralty, (2d ed. 1975) § 9–20; Fathom Expeditions, Inc. v. M/T Gavrion, 402 F.Supp. 390, 397 (M.D. Fla.1975); The Odysseus, III, 77 F.Supp. 297, 298 (S.D.Fla.1948). More particularly, a joint venturer cannot hold a maritime lien because he is not a "stranger to the vessel" but occupies a position akin to that of an owner. See Sasportes v. The M/V Sol de Copacabana, 581 F.2d 1204, 1208 (5th Cir. 1978); P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal, 373 F.Supp. 267, 275 (E.D.N.Y.1974). This doctrine is founded in the equitable notion that those who share responsibility for incurring the debts of the vessel ought not to be reimbursed out of that vessel's proceeds to the detriment of other lienholders. Medina v. Marvirazon Compania Naviera, S.A., 709 F.2d 124 (1st Cir.1983); The Kongo, 155 F.2d 492 (6th Cir.1946); Security Pacific Nat. Bank v. Pacific Pride, 549 F.Supp. 53 (W.D.Wash.1982); G. Gilmore & C. Black, supra.

Based upon these principles and the methods by which SKYPTRON was financed and operated, Redwood, Tramp, and Savoy argue that Lucifer is a joint venturer/part owner and therefore prohibited from holding any lien on the SKYPTRON. The Fifth Circuit case to devote the greatest attention to joint ventures and their relationship to maritime liens identifies the following elements of a joint venture:

1. Intention to create a joint venture
2. Joint control or joint right of control
3. Joint proprietary interest in the subject matter of the venture
4. Right to share in the profits
5. Duty to share in the losses.

Sasportes, 581 F.2d at 1208. However, what appears to be a simple five-part test quickly begins to resemble a "totality of the circumstances" test as the court adds:

But of course these elements cannot be applied mechanically. No one aspect of the relationship is decisive. Many business dealings other than joint ventures might involve, for example, joint property holdings. And although a joint right of control is one of the elements, it is commonplace for one joint venturer to delegate control of operations entirely to the other, creating the appearance that there is no shared control. On the other hand, large creditors may exert some control over a business even when they are unquestionably not joint venturers. Finally, the definition of "joint venture" will vary with the context. If we were deciding whether two parties are jointly liable in tort because they are joint venturers, for example, we might well use a different definition from the one we should use here.

*Id.* (citations and footnote omitted). The joint venture preclusion is an equitable doctrine; the gist of the preclusion seems to be good old fair play. "But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself." *Id.* at 1209.

■ On this record, we cannot hold that Lucifer "looks, thinks, acts, and profits like an owner." We concede that Lucifer's mortgage over the SKYPTRON grants to it a great deal of control over the vessel. However, we find no evidence of any sharing in the profits or obligation to share in the losses of the vessel by Lucifer or by its parent company, Orient. And, although "no one aspect of the relationship is decisive," we hold that, taken together, sharing of profits and losses is a *sine qua non* of the joint venture relationship. We conclude that Lucifer has a valid foreign ship mortgage which imposes an enforceable lien on the SKYPTRON. *See P.T. Perusahaan,* 373 F.Supp. at 278.

b. *Equitable Subordination*

Redwood, Tramp, and Savoy also argue that Lucifer's handling of the SKYPTRON affair should cause this Court to rank its mortgage below all other liens. They base their argument on the following exerpt from Gilmore and Black's treatise:

> Assume that a mortgagee knows that his mortgagor is insolvent and also knows that the mortgagor, if he continues to operate the vessel, will necessarily run up large bills for supplies and repairs which he will be unable to pay in the ordinary course of business. If, under such circumstances, after default, the mortgagee allows the mortgagor to continue his operations, there would be good reason to hold that the mortgage had lost its priority over the post-mortgage liens. It would make no difference whether the result was rationalized in terms of laches (the prejudice to the lienors is sufficiently obvious) or in terms of subordination on equitable principles.

G. Gilmore & C. Black, *supra,* § 9–84.

■ This excerpt is "on all fours" with the facts here. The deposition of M. Hirosawa, the employee of Orient who conducted the operations of Lucifer, indicates that he shared office space with Kardy in Piraeus and was intimately familiar with the financial problems of Kardy and the SKYPTRON. He knew that Kardy defaulted on its loan in November 1982 and continued to allow the SKYPTRON to run up debts. He monitored the financial statements of Kardy and continued to allow the SKYPTRON to run up debts. Under a provision of the mortgage, at any time after November 1982 Lucifer could have taken possession of the vessel *WITHOUT JUDICIAL PROCEEDINGS,* but did not proceed judicially until after the SKYPTRON was seized. Lucifer's agent, Hirosawa, was close enough to the action to hear the financial wolves at Kardy's door, yet continued to allow the vessel and its operators to slip further into debt. Under these circumstances, we do not hesitate to hold that all liens on the SKYPTRON recognized by U.S. law are to be paid in preference to the lien created by Lucifer's mortgage.

## 2. § 953 Liens

■ 46 U.S.C. § 953 grants a preferred maritime lien, superior to all mortgage liens, for "damages arising out of tort" and "for wages of the crew of the vessel." Two claims arguably fall under this provision.

N.L. Industries, as explained above, claims that the financial unseaworthyness of the SKYPTRON resulting in its seizure caused NL to be unable to fulfill its contract to deliver barite to Houston. This, they argue, constitutes a maritime tort which entitles them to a § 953 lien on the vessel in the amount of their damages. Their claim relies on a line of jurisprudence which does not enjoy a national consensus and which has never been recognized by any court this circuit. *Morrisey v. S.S.A. & J. Faith*, 252 F.Supp. 54 (N.D.Ohio 1965); *Oriente Commercial, Inc. v. American Flag Vessel M/V Floridian*, 529 F.2d 221 (4th Cir.1975); *Potash Co. of Canada, Ltd. v. M/V Raleigh*, 361 F.Supp. 120 (D.C.Z. 1973).

Under these cases, the gravamen of the tort alleged is failure to exercise due diligence to furnish a vessel fit to complete its obligations under its charter. *Morrisey*, 252 F.Supp. at 58–59. However, the charter party between Indian Barytes (who has assigned all of its rights under the charter to NL) and· Ultra was amended with the consent of both parties. This amendment altered the contract to allow a one port discharge in exchange for a $.50 per ton reduction in the freight rate. The SKYPTRON has performed 100% of its obligations under this contract. No tort has been committed. The claim of NL Industries is dismissed.

■ N.A.T.'s claim for seamen's pension contributions is also arguably a § 953 lien. However, the clear rule in this circuit is that these contributions are not "wages of the crew of the vessel" under § 953. *Barnouw v. S.S. Ozark*, 304 F.2d 717, 719–20 (5th Cir.), *cert. denied* 371 U.S. 923, 83 S.Ct. 291, 9 L.Ed.2d 231 (1962) (contributions to union welfare trust funds); *Brandon v. S.S. Denton*, 302 F.2d 404 (5th Cir.1962) (welfare, vacation, and pension plans).

## 3. § 971 Liens

46 U.S.C. § 971 provides:

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

The unambiguous terms of the statute clearly indicate that a maritime lien may be enforced *in rem* in United States Court against any vessel, domestic or foreign, by any supplier, domestic or foreign, of repairs, supplies, or necessaries. Ordinarily, this lien is subordinate to the preferred maritime lien created by a foreign ship mortgage. However, in this case due to our application of the doctrine of equitable subordination, any lien valid under this provision will be superior to Lucifer's mortgage.

Applying our earlier analysis to this statute, Cantieri, SLEA, Savoy, Tramp, and Redwood all have § 971 liens which outrank Lucifer's mortgage. We should note that Lucifer has argued that these supplies were furnished on order of the owner of the vessel, rather than the master. Our holding that the master ordered the necessaries does not defeat the lien because 46 U.S.C. § 972 creates a presumption that the master has the owner's authority to order repairs and necessities. In either case, § 971's "on order of the owner of the vessel, or of a person authorized by the owner" requirement is satisfied.

■ Algemene's claim is not so easily dispensed with. The only colorable argument under which they would possess a maritime lien is a theory that their extension of credit to Kardy constituted an advance to the vessel. We have no doubt that a person advancing monies to a vessel

for the purpose of discharging maritime liens inherits the rank of those liens. Counsel for Algemene cite to us the case of *Crustation Transportation Corp. v. Atalanta Trading Corp,* 369 F.2d 656, 659–60 (5th Cir.1966) which clearly so holds. However, the cited case does not spell out all of the elements of the doctrine. On the other hand, citing numerous cases for their conclusions, the authors of *Benedict On Admiralty* state:

> Any person advancing money *to a ship on the order of the master* ... and for the purpose of satisfying outstanding or future claims against the vessel is entitled to a lien of equal dignity with the one replaced, *provided the amounts so advanced are actually applied to the payment of such debts.*

A. Sann, S. Bellman, B. Chase, M. Cheynsky, 2 *Benedict On Admiralty* § 33 (7th ed. 1983) (emphasis supplied) (footnotes omitted). Even given Algemene's version of the facts, the funds were not furnished to the ship on the order of the master and there is no evidence that the money was actually used to pay debts secured by liens. Accordingly, Algemene's claim is dismissed.

### D. Attorney's Fees

This Admiralty Court may award attorney's fees when the nonprevailing party has acted in bad faith or with malice or wanton disregard for the rights of its opponents. See *Platoro, Ltd. v. Unidentified Remains of a Vessel,* 695 F.2d 893, 905–06 (5th Cir.1983); *Frontera Fruit Co., v. Dowling,* 91 F.2d 293, 297 (5th Cir. 1937). Of the many claims for attorney's fees in this case, only that of Lake City Stevedores is to be placed in this catagory. Stevedores was entitled beyond a doubt to payment under any conceivable choice of law. Nevertheless, Lucifer refused to stipulate to Stevedores' claim on two different occasions, finally stipulating to it on the day of trial. Accordingly, we grant Stevedore's claim for attorney's fees in the amount of $9,140.00. We deny all other claims for fees.

## IV. CONCLUSION AND JUDGMENT

It has been said that Law is but a crude approximation of divine justice and that the more perfect different legal systems become, the more they become similar and converge upon the divine ideal. This case seems to bear out this observation because different analysis under different ranking schemes and legal systems arrived at the same result.

Under our holding that Lucifer has waived its preferred status as to those liens described by Article 2 of the Brussels Convention of 1926, we rank the liens on the SKYPTRON as follows and render judgment accordingly:

*1. Liens to be paid in full in Precedence to Lucifer's Mortgage*

1. Cantieri Navali Riuniti ....... $ 71,000.00
2. Societe des Lubrifiant Elf Aquitaine ................... 21,700.50
3. Savoy Marine ............... 9,395.45
4. Tramp Oil and Marine, Inc. .... .72,110.57
5. Redwood Bunkering ......... 122,064.89
6. Lake City Stevedores ........ 9,140.00

All of the above to be with legal interest from date of judgment until paid.

*2. Lien to be Paid in Part with Remaining Funds*

1. Lucifer (Panama), S.A. ....... All remaining funds in the registry of the Court.

*3. Liens Asserted but Not to be Paid*

1. N.L. Industries
2. Alegemene Bank Nederland
3. N.A.T.

The Court will in due course, sign a judgment ordering the Clerk to distribute the funds in the registry of the Court accordingly.

Counsel for Lake City Stevedores is to prepare a judgment and submit same. This judgment is to cover all matters here decided.