581 F.2d 1204
 Julien Andre SASPORTES, Plaintiff,
v.
M/V SOL DE COPACABANA, her engines etc. and Navexport, S.A., Defendant,
Banco De Credito Industrial, S.A., Plaintiff.
STAR-KIST FOODS, INC., a Foreign Corp., Plaintiff-Appellant,
v.
M/V SOL DE COPACABANA, her engines, tackle, boilers
appurtenances, etc., Defendants,
Banco De Credito Industrial, S.A., Plaintiff-Appellee.
BANCO DE CREDITO INDUSTRIAL, S.A., Plaintiff,
v.
M/V SOL DE COPACABANA, her engines, tackle, etc. and
Navexport, S.A., Defendant.
 No. 76-2577.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 16, 1978.
 
 James H. Roussel, New Orleans, La., Roger W. Rosendahl, Robert E. Coppolla, Los Angeles, Cal., for plaintiff.
 Carlos Arosemena, Panama, T. C. W. Ellis, New Orleans, La., for defendant.
 Appeal from the United States District Court for the District of the Canal Zone.
 Before COWEN,* Senior Judge and GOLDBERG and AINSWORTH, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 The M/V Sol de Copacabana was a Spanish tuna-fishing vessel owned by the Spanish corporation Navexport, S.A. It ran upon hard times and was caught in its creditors' nets and sold at judicial sale. Here two creditors compete for a portion of the proceeds of the sale. Appellee Banco de Credito Industrial, S.A., a Spanish corporation, holds a preferred ship mortgage against the Copacabana. Appellant Star-Kist Foods, Inc., claims to hold a maritime lien against the ship under the Federal Maritime Lien Act, 46 U.S.C. §§ 971-974, for advances it made to and on behalf of the vessel. Because the Copacabana is a foreign ship, the maritime lien at least to the extent it arose out of expenditures made in the United States would take priority over the preferred ship mortgage. See 46 U.S.C. § 951. But the district court below found that Star-Kist's relationship to Navexport, the Copacabana's owner, amounted to a joint venture. This would disqualify Star-Kist from being a maritime lienor and put it in a position inferior to Banco de Credito. Star-Kist appeals. We reverse.
 
 
 2
 Star-Kist Foods is, among other things, a tuna canning company. From December 26, 1971, through March 12, 1975, it repeatedly advanced money to the Copacabana and on its behalf. Of these expenses, $168,045.84 has not been repaid by Navexport and Star-Kist claims that amount plus interest, or $214,968.86. Meanwhile, on January 23, 1974, Navexport gave Banco de Credito a mortgage of approximately $2,488,100 on the Copacabana. On March 21, 1975, Julien Andre Sasportes, a creditor of Navexport who is not a party to this appeal, brought an action in the United States District Court for the Canal Zone. He sued Navexport In personam and the Copacabana In rem. On June 4, 1975, appellant Star-Kist brought suit in the same court, and on July 17 appellee Banco de Credito did likewise. That court entered default judgments against Navexport and the Copacabana. The Copacabana was sold at judicial sale on July 21, 1975, for $295,000. These proceeds were paid into the registry of the federal district court pending its decision on the order of priority among the creditors.
 
 
 3
 On April 21, 1976, that court held, Inter alia,[1] that Banco de Credito's mortgage was a preferred ship mortgage under 46 U.S.C. § 951. Because the Copacabana was a foreign vessel, however, such mortgages are subordinate to "maritime liens for repairs, supplies . . . or other necessaries, performed or supplied in the United States." 46 U.S.C. § 951. Star-Kist asserted such a lien. The bulk of its advances were made in the United States and went to seamen for their wages and to the suppliers of necessaries,[2] both of whom are entitled to maritime liens. See 46 U.S.C. § 971.[3] A creditor who advances money specifically for the purpose of discharging a maritime lien is subrogated to the lienor's rights. Crustacean Transportation Corp. v. Atalanta Trading Corp., 369 F.2d 656, 659-60 (5th Cir. 1969). See generally G. Gilmore and C. Black, The Law of Admiralty (1957) § 9-21. But an owner, part owner, or joint venturer cannot hold a maritime lien. See id., § 9-20 at 513; Fathom Expeditions, Inc., v. M/T Gavrion, 402 F.Supp. 390, 397 (M.D.Fla.1975); The Odysseus III, 77 F.Supp. 297, 298-99 (S.D.Fla.1948). The district court ruled that Star-Kist could not claim a maritime lien because it had been engaged in a "joint venture" with Navexport.
 
 
 4
 The district court based this conclusion on two contracts which Star-Kist[4] and Navexport had signed. The first of these, dated October 17, 1971, required Star-Kist to buy and, with one exception, obligated Navexport to sell the Copacabana's entire catch at a price specified in the contract. The specified price was, roughly, either a price agreed upon between Star-Kist and a majority of United States tuna vessels or, if no agreement was reached, the market price.[5] The one exception was that if Navexport were able to obtain a higher price by selling the fish outside the United States, Star-Kist could compel Navexport to sell to it only by paying the contract price plus half the difference between the contract price and the higher foreign sale price. If Star-Kist were unwilling to pay the higher price, and Navexport made the sale elsewhere, Navexport would have to pay Star-Kist a penalty of half the difference between the two prices. The second contract went into effect on January 1, 1973. It was similar to the first contract in most respects.[6] Star-Kist argues that the district court erred when it held that these agreements created a joint venture.
 
 
 5
 Courts and commentators have identified several characteristics of joint ventures. The parties' intentions are important. Misco-United Supply, Inc., v. Petroleum Corp., 462 F.2d 75, 79 (5th Cir. 1972) (Tex. law). Joint ventures involve joint control or the joint right of control, See, e. g., Detachable Bit Co. v. Timken Roller Bearing Co., 133 F.2d 632, 635 (6th Cir. 1943), and joint proprietary interests in the subject matter of the venture, See, e. g., Swann v. Ashton, 330 F.2d 995, 996 (10th Cir. 1964) (Colo. law). Both venturers share in the profits, See, e. g., Beavers v. West Penn Power Co., 436 F.2d 869, 873 (3d Cir. 1971) (Pa. law), and both have a duty to share in the losses, See Pan American Airways, Inc., v. Quilez, 154 F.2d 496, 496 (5th Cir. 1946). But of course these elements cannot be applied mechanically. No one aspect of the relationship is decisive. See Hyman v. Regenstein, 258 F.2d 502, 513 (5th Cir. 1958), Cert. denied 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959). Many business dealings other than joint ventures might involve, for example, joint property holdings. And although a joint right of control is one of the elements, it is commonplace for one joint venturer to delegate control of operations entirely to the other, creating the appearance that there is no shared control. See, e. g. Shell Oil Co. v. Prestidge, 249 F.2d 413, 416 (9th Cir. 1957). On the other hand, large creditors may exert some control over a business even when they are unquestionably not joint venturers. Finally, the definition of "joint venture" will vary with the context. If we were deciding whether two parties are jointly liable in tort because they are joint venturers,[7] for example, we might well use a different definition from the one we should use here.
 
 
 6
 Joint venturers cannot hold maritime liens because they are not " strangers to the vessel," P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal, 373 F.Supp. 267, 275 (E.D.N.Y.1974), but rather occupy a position akin to that of the vessel's owner. Perhaps the best example of a joint venturer would be a party whose prospective gains resemble the owner's, who has the owner's prerogatives, and who might otherwise appear to investigating creditors to be a part owner. Such a party may, of course, have an In personam contract claim against the true owner. But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself.
 
 
 7
 Certain aspects of the dealings between Star-Kist and Navexport may suggest that Star-Kist was such a joint venturer. Their relationship lasted for some time and involved quite frequent dealings. Star-Kist advanced funds for a few other purposes besides the provision of necessaries.[8] More crucial features were lacking, however. First, we disagree with the district court's conclusion that Star-Kist participated in the Copacabana's profits in any important sense. Had the contract specified an unusually low price, for example, we might suspect some sort of profit sharing. But it is apparent that sales at the actual contract price the negotiated or market price would not as a general matter divide the ship's profits between Star-Kist and Navexport. The provisions allowing Star-Kist to compel the Copacabana's sale or (in the first contract) to extract a penalty are different. They did have the effect of sharing a portion of the Copacabana's profits the portion attributable to the extra revenue gained by selling above the contract price between Navexport and Star-Kist. But this is far from a general agreement to share profits. These provisions operated only when the Copacabana's catch could command a price higher than the contract price. Only a portion of the profits would have been shared in any event. Most importantly, these provisions seem clearly designed to serve another purpose than profit sharing; indeed if they were intended for that purpose they were very poorly designed. By contrast, they are the natural result of bargaining between a canner who wishes to ensure an adequate supply of fish at a reasonably predictable price, on the one hand, and a fishing company which wants a guaranteed market but also wants some flexibility to sell at a higher price if one is available. Similarly, Star-Kist apparently exerted no significant control over the Copacabana beyond that which any creditor and contract obligee might have. It did not, for example, dictate Navexport's decisions about where to fish, whom to hire, what techniques to use, and the like. In fact, subject to an implied obligation to perform in good faith, See, e. g., Restatement (Second) of Contracts § 231 (Tent. Ed. 1973), the Copacabana did not have to sail or fish at all. Under these circumstances, we must hold that the district court erred in finding a joint venture.
 
 
 8
 Banco de Credito also argues, and the district court apparently agreed, that Star-Kist has no maritime lien because it relied only on the personal credit of the owner, Navexport, and not on the credit of the ship. Even under the best of circumstances this position is difficult to sustain. The Federal Maritime Lien Act explicitly instructs us to presume that those who furnish repairs, supplies, and other necessaries looked to the credit of the vessel itself and not just to the owner,[9] and in this circuit the presumption is very strong. See Inland Credit Corp. v. M/T Bow Egret, 552 F.2d 1148, 1152 n.4 (5th Cir. 1977); Veverica v. Drill Barge Buccaneer No. 7,488 F.2d 880, 883 (5th Cir. 1974); Point Landing, Inc., v. Alabama Dry Dock & Shipbuilding Co., 261 F.2d 861, 867-68 (5th Cir. 1958). Since Star-Kist was subrogated to the claims of those creditors, Banco de Credito must prove that Star-Kist deliberately intended "to forego the valuable privilege which the law accords and look solely to the owner's personal credit." Seeid. at 867. Here Banco de Credito has not borne that "severe burden," Id. at 868. Banco de Credito argues that Star-Kist was content to have Navexport repay the debt only out of the proceeds of the catch, but that alone does not begin to show that Star-Kist was an ordinary creditor. See Pavlis v. Jackson, 131 F.2d 362, 365 (5th Cir. 1942).[10] Banco de Credito has adduced little other evidence that Star-Kist relinquished its lien rights. Star-Kist, for example, had many of the invoices it paid issued to the ship itself and not to Navexport. This practice suggests that it intended to rely on the credit of the ship. We must reverse the district court on this point as well.
 
 
 9
 Our cases support the conclusion that Star-Kist was a maritime lienor and neither waived its rights nor became a joint venturer. In Inland Credit Corp. v. M/T Bow Egret, 552 F.2d 1148 (5th Cir. 1977), we dealt with the claims of creditors who had been promised a percentage of the vessel's profits in addition to the repayment of their principal and interest. We affirmed the district court's holding that they were not joint venturers. One of those creditors had obtained a personal guarantee of his loan from the president of the shipping company, and we held that this did not constitute a waiver of his lien rights. In Crustacean Transportation Corp. v. Atalanta Trading Corp., 369 F.2d 656 (5th Cir. 1966), the creditor advanced money for supplies in return for five percent of the ship's profits in addition to his principal and interest. The creditor also took another security interest besides any interest he had in the vessel. We upheld the district court's decision that there was neither a joint venture nor a waiver of lien rights. In Point Landing, Inc., v. Alabama Dry Dock Shipbuilding Co., 261 F.2d 861 (5th Cir. 1958), we held that the presumption that a creditor relied on the credit of the vessel was not overcome even when a creditor took a promissory note from the vessel owner, a chattel mortgage on the vessel, and a mortgage on real estate held by the vessel's owner. Here, to be sure, we are reversing the district court; Inland Credit and Crustacean upheld lower court rulings. But the facts of those cases were far more unfavorable to the creditors asserting liens than our facts are to Star-Kist.
 
 
 10
 On remand the court below will have to make two relatively minor adjustments in the amounts claimed by Star-Kist. Under the Federal Maritime Lien Act, "repairs, supplies, . . . (and) other necessaries" can give rise to maritime liens. 46 U.S.C. § 971. Star-Kist's accounting reveals that by far the greater proportion of its advances were made for such purposes. Nevertheless, some of its payments were for insurance premiums, telephone calls, hotel rooms and similar items which may or may not be "necessaries."[11] On remand, the district court should determine whether they are. It should bear in mind our expansive definition of necessaries. See J. Ray McDermott & Co. v. Off-Shore Menhaden Co., 262 F.2d 523, 525 (5th Cir. 1959). See also, Colonial Press of Miami, Inc., v. The Allen's Cay, 277 F.2d 540, 541 (5th Cir. 1960). Finally, a preferred ship mortgage is subordinated to any lien which arose before the mortgage was recorded and endorsed and to, among others, "a lien for . . . wages of the crew of the vessel." 46 U.S.C. § 953. As we have said, a foreign preferred ship mortgage like Banco de Credito's is outranked by any "maritime liens for repairs, . . . or other necessaries, Performed or supplied in the United States." 46 U.S.C. § 951 (emphasis added). Of the advances Star-Kist made after the date of the Banco de Credito mortgage, most but not all were made in the United States. Some of the others are for wages. The rest, it seems, do not have priority over the foreign preferred ship mortgage. The district court should make these calculations.
 
 
 11
 We reverse the district court's holding that Star-Kist's claims are not maritime liens, and we remand for proceedings consistent with this opinion.
 
 
 12
 REVERSED and REMANDED.
 
 
 
 *
 Senior Judge of the United States Court of Claims, sitting by designation
 
 
 [1]
 It also concluded that Joseph Correia, the "fish" captain of the ship, had a valid maritime lien for wages and that Sasportes's claim was not a maritime lien. These conclusions are not before us on this appeal
 
 
 [2]
 See pp. 1210-1211, Infra
 
 
 [3]
 46 U.S.C. § 971 provides:
 "Any person furnishing repairs, supplies, . . . or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."
 
 
 [4]
 In fact the agreements were between Navexport and Star-Kist Caribe, Inc., a wholly-owned subsidiary of Star-Kist Foods, Inc. The district court treated Star-Kist Caribe and Star-Kist Foods as the same entity. Indeed in its complaint Star-Kist Foods averred that the contracts were between it and Navexport. On appeal Star-Kist Foods insists that it and Caribe are not alter egos, but its brief proceeds on the assumption that they may be treated as one. We shall make the same assumption
 
 
 [5]
 The contract reads:
 . . . Canner will from time to time negotiate with a majority of the U. S. flag tuna vessels operating for Canner . . . upon (1) prices, or (2) a method of determining the prices, to be paid for fish. In the event agreement is reached with the majority of vessels as to such prices or method of determining prices, the prices to be paid pursuant to this agreement shall either be (1) those prices or (2) prices determined by the method agreed upon, for the period agreed upon.
 In the event agreement cannot be reached with a majority of the vessels on prices or a method of determining prices, the prices to be paid hereunder shall be the prevailing market prices. App. at 7.
 
 
 [6]
 The principal difference was that the January 1, 1973, contract permitted Navexport to sell at a higher price in Europe or the United States unless Star-Kist met the higher price "less a discount of ten dollars . . . per short ton." App. at 14
 
 
 [7]
 Several of the cases cited by the parties involve such other contexts. See, e. g., Shell Oil Co. v. Prestidge, 249 F.2d 413 (9th Cir. 1957) (tort liability); United States ex rel. Altman v. Young Lumber Co., 376 F.Supp. 1290, 1296-97 (D.S.C.1974) (suit under Miller Act, 40 U.S.C. § 270b)
 
 
 [8]
 See 1210 Infra
 
 
 [9]
 46 U.S.C. § 971, quoted at 1207 n. 3, Supra, concludes "it shall not be necessary to allege or prove that credit was given to the vessel."
 
 
 [10]
 It might tend to show that Star-Kist was insufficiently diligent in prosecuting its claim, so that its lien is barred by laches. This defense is preserved by the Federal Maritime Lien Act 46 U.S.C. § 974 provides that "this chapter shall not be construed to affect the rules of law existing on June 5, 1920, in regard to . . . laches in the enforcement of liens upon vessels" and Banco de Credito raises it. But whether a lien is barred by laches "is a question primarily addressed to the discretion of the trial court," Gardner v. Panama R. Co., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951), and the district court ruled against Banco de Credito on this point, apparently because the defense was not properly raised. See Second Supp. Record on Appeal (Part I), at 64. This ruling was not an abuse of discretion, especially since we have held that the party asserting laches must show not only delay but delay prejudicial to its interests, See Marine Bank v. T. E. Welles, 289 F.2d 188, 191 (5th Cir. 1961), and Banco de Credito has not made such a showing
 
 
 [11]
 On this point Star-Kist's own accounting, App. at 21-25, may be misleading. It classifies Star-Kist's expenditures on behalf of the Copacabana under six headings: seamen's wages, fuel, supplies, accessories and repairs, "other," and "non-priority." The itemization reveals, however, that the bulk of the items comprised by the last two categories do give rise to liens