**FULCHER'S POINT PRIDE SEAFOOD, INC., Plaintiff,**

v.

**M/V "THEODORA MARIA," Her Engines, Her Boilers, etc., Defendant.**

**FULCHER'S POINT PRIDE SEAFOOD, INC., Plaintiff,**

v.

**M/V "LADY MARY," Her Engines, Her Boilers, etc., Defendant.**

Nos. CV 290–010, CV 290–011.

United States District Court, S.D. Georgia, Brunswick Division, In Admiralty.

Oct. 25, 1990.

ORDER

ENDENFIELD, Chief Judge.

The plaintiff, Fulcher's Point Pride Seafood, Inc. ("Fulcher's Point"), brought these *in rem* actions under Federal Rule of Civil Procedure 9(h) to assert a maritime lien against the fishing vessels, Theodora Maria and Lady Mary, ("the fishing boats"). Fulcher's Point claims to have furnished the fishing boats with "advances, supplies, repairs, and other necessities." The plaintiff claims $45,858.82 from the Theodora Maria and $2,844.56 from the Lady Mary. On July 25, 1990, the Court ordered the Lady Mary released after John Caustin ("Caustin"), the fishing boats' owner, stipulated that any lien that Fulcher's Point might have against the Lady Mary could be treated as being transferred to the Theodora Maria.

John Caustin filed claims of ownership and applied to have the boats released under Rule E(4)(f), Supplemental Rules for Certain Admiralty and Maritime Claims, Fed.R.Civ.P. The Court heard evidence on this issue on February 12, 1990.

The issue in this case is whether Fulcher's Point has a maritime lien for necessaries on the fishing boats. Caustin contends that Fulcher's Point has no maritime lien because it was participating in a joint venture with the fishing boats. Fulcher's Point denies that the arrangement it had with Caustin constituted a joint venture.

At a hearing held on September 24, 1990, the Court denied Fulcher's Point's motion for an interlocutory sale of the Theodora Maria. The parties agreed that the testimony given and other evidence offered in the February 12, 1990 hearing would be treated as the parties' evidence on liability in lieu of a formal trial. The Court granted Fulcher's Point the right to supplement the record with evidence of his damages. The Court has reviewed the pleadings, briefs, and evidence, including testimony, and now makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).[1]

Charles G. Spaulding, Brunswick, Ga., for Fulcher's Point Pride Seafood, Inc.

George Chamlee, Savannah, Ga., for John Caustin, claimant.

John R. Ferrelle, Brunswick, Ga., for South Atlantic Production.

---

1. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

**1070**

## I. Findings of Fact

Fulcher's Point Pride Seafood, Inc., is a seafood packing house located at Oriental, North Carolina. The principal officer of the corporation is Chris Fulcher.[2]

John Caustin lives in Hampstead, North Carolina. He sells seafood for a wholesale company and owns and operates fishing boats, including the Theodora Maria and the Lady Mary.

Fulcher and Caustin had a long business relationship, going back fifteen or twenty years. Prior to 1988, the extent of the business relationship was that Caustin often operated his vessels in the area near Fulcher's packing house, sold seafood caught on his vessels to Fulcher's Point, and purchased supplies for these vessels from Fulcher's Point. The two men trusted each other a great deal.

In February 1988, Caustin, or more accurately Caustin's boats, owed Fulcher some money for supplies furnished to the boats. The Lady Mary was located in North Carolina, and the Theodora Maria was fishing in Georgia waters. Both were losing money.

Fulcher thought he could remedy the situation for Caustin, and derive some benefit of his own at the same time. At Fulcher's prompting, Caustin and Fulcher entered an informal agreement concerning the Lady Mary and the Theodora Maria. Pursuant to this casual, oral agreement, Caustin sent these boats to Fulcher's dock in Oriental, North Carolina. Fulcher agreed to provide supplies and other necessaries to the boats; and, over the course of the agreement, Fulcher provided many supplies and other necessaries.

In addition to providing supplies, Fulcher agreed to procure ship captains familiar with the area to handle the operation of the vessels. Although Fulcher testified that he and Caustin jointly decided whether to hire or fire captains, the Court finds that Fulcher hired and fired captains without consulting Caustin.

The parties did not intend for Fulcher to share in the profits of the boat. Instead, Caustin was to receive all profits from the boat, and Fulcher would benefit from the arrangement by the increased business at his dock. The parties never discussed who was to bear any losses from the boats because both Fulcher and Caustin assumed that the boats would make profits.

Fulcher, of course, did expect to profit from the agreement. He hoped his business would profit from packing and selling catches from Caustin's boats. Furthermore, he planned to supply the boats with necessaries, including repairs, ice, and fuel, as he did to other boats who off-loaded at his dock. Fulcher's Point bought the catches from Caustin's boats at market prices, and there is no evidence that Fulcher's Point overcharged the boats for necessaries supplied to them. Nevertheless, Fulcher's Point profited from the arrangement.

The parties assumed that the fishing boats would dock at Fulcher's dock most of the time. Fulcher promised that he would oversee the captains to make sure they did not misappropriate the catches, since the parties believed misappropriation was "one thing between making it and, you know, breaking it." Testimony of John Caustin, Transcript at 41. Fulcher may not have explicitly required captains to off-load at his dock; however, the captains ordinarily

---

Fed.R.Civ.P. 52(a) requires a district court to issue findings of fact and conclusions of law whenever it conducts a bench trial. The findings of fact must be specific enough for a reviewing court to identify the factual findings upon which the court's legal conclusions are based. *E.g., Stock Equip. Co. v. TVA,* 906 F.2d 583, 592 (11th Cir.1990). This Court need not, however, make "a finding on every contention raised by the parties," *Feazell v. Tropicana Prods., Inc.,* 819 F.2d 1036, 1042 (11th Cir.1987), but the findings "must be sufficiently detailed to give [a reviewing court] a clear understanding of the analytical process by which the ultimate findings were reached...." *Id.* (quoting *Golf City, Inc. v. Wilson Sporting Goods, Inc.,* 555 F.2d 426, 433 (5th Cir.1977)).

**2.** Although corporations are discrete legal entities, they must act through individuals. Fulcher's Point Pride Seafood usually acted through Chris Fulcher. In this order, references to actions taken by Chris Fulcher indicate actions he took on the behalf of the corporation, Fulcher's Point.

did so. On the rare occasion that the captains off-loaded at other docks, the owners of the docks usually sent the money for the catches to Chris Fulcher, not to John Caustin. Fulcher testified that the boats off-loaded at other docks probably more than two or three times, yet Caustin received a check from a dock owner only once. Although the testimony did not show how other dock owners knew to send the checks to Fulcher rather than Caustin, the Court finds that they believed that Fulcher managed and perhaps owned the boats.

When Fulcher received money from other dock owners, he credited the account he had for the Lady Mary or the Theodora Maria. Fulcher's Point prepared "trip tickets," sheets revealing the catches and the revenue from them, whenever one of the boats off-loaded. Both Fulcher and Caustin testified that ordinarily, a dock owner would send the trip ticket to the boat owner immediately. The Court finds that, contrary to the ordinary practice in the trade, Caustin did not receive any of them until tax season.

Before the agreement, the Theodora Maria was shrimping, while the Lady Mary was flounder fishing. Subsequent to the agreement, the Theodora Maria was converted to scallop fishing, and the Lady Mary, to float fishing. Although Caustin knew that Fulcher would use the boats both for shrimping and for various kinds of fishing, Fulcher decided what kind of fishing the boats would do at any particular time.

## II. Conclusions of Law

This is an admiralty and maritime action within the meaning of 28 U.S.C. § 1333 (1988) and Rule 9(h) of Fed.R.Civ.P.; thus, the Court has subject matter jurisdiction in this case. Furthermore, the Lady Mary and the Theodora Maria are vessels capable of being subject to maritime liens; therefore, this Court has jurisdiction over the vessels *in rem. Miami River Boat Yard, Inc. v. 60' Houseboat, Serial*

# *SC–40–2860–3–62,* 390 F.2d 596, 597 (5th Cir.1968).[3]

## A. Presumption of Maritime Lien

■ The issue in this case is whether Fulcher's Point has a maritime lien against the Lady Mary and the Theodora Maria. The Federal Maritime Lien Act provides:

A person providing necessaries to any vessel (except a public vessel) on the order of a person listed in section 31341 of this title or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342 (1988). Once a plaintiff establishes that he furnished necessaries to a vessel, a presumption attaches that he relied on the credit of the ship and consequently has a maritime lien. *Crustacean Transp. Corp. v. Atalanta Trading Corp.,* 369 F.2d 656, 660 (5th Cir.1966). In the Eleventh Circuit, the presumption is very strong. *Sasportes v. M/V SOL DE COPACABANA,* 581 F.2d 1204, 1209 (5th Cir. 1978). Caustin concedes that Fulcher's Point Pride supplied necessaries to the boats; thus, there is a strong presumption that Fulcher's Point has a maritime lien on the boats.

## B. Joint Venture

■ Caustin claims he can overcome this presumption, however, because his arrangement with Fulcher constituted a joint venture. Joint venturers cannot hold a maritime lien on a vessel because they are not "strangers to the vessel." *Sasportes,* 581 F.2d at 1208. Thus, if Caustin and Fulcher's Point were joint venturers, Fulcher's Point's claim must fail. Because of the presumption, however, Caustin has the affirmative burden of proving that the arrangement was a joint venture. If he cannot prove that a joint venture existed, then

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions rendered on or before September 30, 1981.

Fulcher's Point has a maritime lien on the boats.

> Such a party may, of course, have an *in personam* contract claim against the true owner. But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself.

*Id.* at 1208–09.

■ A joint venture or joint enterprise exists when two or more combine their property or labor, or both, in a joint undertaking for profit with rights of mutual control, provided the arrangement does not establish a partnership. *E.g., Southern Pine Products, Inc. v. Waller*, 122 Ga.App. 288, 176 S.E.2d 631 (1970). As the Former Fifth Circuit recognized, however, the definition cannot be applied mechanically, and the precise definition of "joint venturer" will vary with the context. *Sasportes*, 581 F.2d at 1208. "If we were deciding whether two parties are jointly liable in tort because they are joint venturers, for example, we might well use a different definition from the one we use here [in the context of maritime liens]." *Id.*

In *Sasportes*, the Former Fifth Circuit reversed the district court's determination that Star–Kist, who claimed a maritime lien on the M/V Sol de Copacabana, was a joint venturer with Navexport, the owner of the vessel. *Id.* at 1209. Star–Kist and Navexport signed agreements that in essence required all of the Copacabana's catch to be sold to Star–Kist. *Id.* at 1208. The parties agreed that the price would be a negotiated or market price. Navexport could sell to others only if it could fetch a higher price outside of the United States. In that event, Star–Kist could compel Navexport to sell to it by paying the contract price plus half the difference between the contract price and the higher foreign sale price. If Navexport did sell the tuna elsewhere, it had to pay Star–Kist a penalty of half the difference between the two prices. *Id.*

Before determining that this arrangement was not a joint venture, the *Sasportes* court created a checklist of the elements of a joint venture: (1) intention of the parties to create a joint venture; (2) joint control or joint right of control; (3) joint proprietary interests in the subject matter of the venture; (4) right of both venturers to share in the profits; and (5) duty of both to share in the losses. *Id.* at 1208. From this list, the court identified the crucial features of a joint venture and found that the relationship between Star–Kist and Navexport lacked both. First, Star–Kist did not participate in Copacabana's profits to a significant degree, although the court noted that the exceptions allowing Star–Kist to compel sale or to extract a penalty did have the effect of sharing a portion of the boat's profits. Second, Star–Kist did not dictate Navexport's decisions about "where to fish, whom to hire, what techniques to use, and the like." *Id.* at 1209. Because profit-sharing and control were absent, the court held that Star–Kist and Navexport were not joint venturers.

1. Profit Sharing as an Aspect of Joint Venture

This case is not as clear-cut as *Sasportes* because Fulcher did not share in the profits and losses, but he controlled the boats' operations. The absence of profit-sharing suggests the arrangement was not a joint venture. Fulcher contends, and Caustin conceded in his February testimony, that Caustin was to receive all of the profits from the boats. Although Fulcher did not regularly send checks for proceeds to Caustin, he credited the boats' accounts with the profits. If the boats had operated at a profit, Fulcher would have been obligated to turn the profits over to Caustin. Furthermore, the parties did not contemplate losses; consequently, they did not agree that Fulcher would bear any losses. Caustin contends that Fulcher "guaranteed" that the boats would profit, but this statement was not a guarantee in the legal sense. Instead, the context reveals that the statement was mere puffery.[4] Thus,

4. According to Caustin, Fulcher said, "Why don't you let me bring these boats up there and let me look after them for you, and I'll guarantee you I'll make you some money. I'll put

the parties did not intend Fulcher to share the profits and losses of the boats.

The district court for the Western District of Louisiana, applying the principles outlined in *Sasportes*, held that sharing of profits and losses was the most important indication of a joint venture relationship. *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F.Supp. 171 (W.D.La.1985), *modified on other grounds*, 802 F.2d 160 (5th Cir.1986). In *Cantieri*, claimants insisted that the first preferred mortgage of Lucifer (Panama), S.A., gave Lucifer all of the powers of ownership, rendering it not a "stranger to the vessel." *Id.* at 179, 186–87. The court stated:

> On this record, we cannot hold that Lucifer "looks, thinks, acts, and profits like an owner." We concede that Lucifer's mortgage over the SKYPTRON grants to it a great deal of control over the vessel. However, we find no evidence of any sharing in the profits or obligation to share in the losses of the vessel by Lucifer or by its parent company, Orient. And, although "no one aspect of the relationship is decisive," we hold that, taken together, sharing of profits and losses is a *sina qua non* of the joint venture relationship. We conclude that Lucifer has a valid foreign ship mortgage which imposes an enforceable lien on the SKYPTRON.

*Id.* at 187 (citation omitted).

## 2. Control as an Aspect of Joint Venture

If this Court were to follow *Cantieri*, it would not need to determine whether Fulcher's Point exerted control over the boats' operation, for, as mentioned above, Fulcher did not share in the boats' profits and losses. The *Sasportes* court itself noted that "large creditors may exert some control over a business even when they are unquestionably not joint venturers." *Sasportes*, at 1208. The *Cantieri* court did not acknowledge, however, that *Sasportes* included control as one of the "more crucial features" of a joint venture. This conclusion did not change the result in *Sasportes* because the court concluded that Star-Kist's control was insignificant. Star-Kist "did not, for example, dictate Navexport's decisions about where to fish, whom to hire, what techniques to use, and the like." *Id.* at 1209.

Unlike Star-Kist, Fulcher's exercised significant control over the Lady Mary and the Theodora Maria. First, he controlled where the boats fished, or more accurately, where they docked. He never explicitly directed captains to fish near his dock at all times, but the requirement was implicit. The captains docked elsewhere on only a few occasions. After all, the reason Caustin agreed to the arrangement was to ensure that someone would look after his boats and check up on their captains, and Fulcher benefitted from the arrangement only if the boats remained near his dock. Fulcher also dictated what captains would be in charge of the boats. Furthermore, although Caustin knew the boats would do various kinds of fishing depending on what was most profitable, Fulcher controlled those decisions. In short, Fulcher dominated the operation of the boats.

As *Sasportes* indicated, no one aspect of a relationship makes it a joint venture, but Fulcher's control of this relationship was so complete that other aspects have decreased significance. Because Fulcher controlled the operations of the boats so completely, the absence of any true sharing in the *boats' revenues*, for example, is less important in determining whether the arrangement was a joint venture. Moreover, Fulcher did profit from the arrangement in another sense. He used his control of the boats to increase profits in his own business. It is true that he did not charge Caustin's boats more for necessaries or underpay him for catches, but he virtually guaranteed his business a steady supply of seafood and a steady customer for repairs and supplies. Thus, al-

some captains on the boat, and I'll guarantee you. I'll bring them back to my docks. I'll look after them; keep the boats up." ... "you know, they won't pack anywhere. I can look after them, and the captains won't be stealing anything from them." ... "we'll make some money out of this thing." ... "I'll guarantee you I will make you some money." Transcript, at 34–35.

though he did not share in the boats' profits in a technical sense, he profited from a business that he controlled. Given the significant control Fulcher had over the boats' operations, and the profits his business derived from that control, the Court holds that Fulcher's Point and John Caustin were engaged in a joint venture.

### III. Conclusion

Because Fulcher's Point supplied necessaries to the vessels Lady Mary and Theodora Maria, a presumption arose that Fulcher's Point had a lien on the vessels. John Caustin has overcome this presumption, however, by proving that Fulcher exerted significant control over the operation of the boats and that his business profitted from this control. These factors amounted to proof that Fulcher's Point and John Caustin were joint venturers. As a joint venturer, Fulcher's Point is not a "stranger to the vessel," and only strangers to a vessel can hold a maritime lien against it.

The Court therefore holds that Fulcher's Point does not have a maritime lien against the Lady Mary or the Theodora Maria. Accordingly, the Court renders JUDGMENT FOR THE DEFENDANT.

SO ORDERED.