**FULCHER'S POINT PRIDE SEAFOOD, INC., Plaintiff–Appellant,**

**Phillips Seafood, Inc., Intervenor,**

**v.**

**M/V "THEODORA MARIA," Her Engines, Boilers, etc., Defendant–Appellee.**

**FULCHER'S POINT PRIDE SEAFOOD, INC., Plaintiff–Appellant,**

**South Atlantic Production Credit Association, Intervening Plaintiff,**

**v.**

**M/V "LADY MARY," Her Engines, Boilers, etc., Defendant–Appellee.**

No. 90–9042.

United States Court of Appeals, Eleventh Circuit.

July 5, 1991.

---

Charles G. Spalding, Brunswick, Ga., for plaintiff-appellant.

George Chamlee, Savannah, Ga., for defendant-appellee.

Before ANDERSON and DUBINA, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Fulcher's Point Pride Seafood, Inc. ("Fulcher") filed *in rem* actions pursuant to Fed.R.Civ.P. 9(h) against two fishing vessels, the "Theodora Maria" and the "Lady Mary," seeking maritime liens arising under 46 U.S.C. § 31342 (1988) for the provision of necessaries to the vessels. The vessels were arrested, and the alleged liens later consolidated against only the "Theodora Maria." The vessels' owner, John Caustin ("Caustin"), sought to have the boats released pursuant to Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims, Fed.R.Civ.P. After hearing evidence, the district court rendered its findings and conclusions in October 1990.[1] The court concluded that Fulcher and Caustin had entered into a joint venture for the operation of the two vessels. Thus, Fulcher was not a stranger to the vessels and could not hold maritime liens against them. This appeal raises the question of whether a joint venture existed between Fulcher and Caustin. We agree with the district court and affirm its order of judgment for the vessels.

## I. BACKGROUND

We borrow liberally from the district court's findings of fact in our statement of the facts of this case.

Fulcher's ... is a seafood packing house located at Oriental, North Carolina. The principal officer of the corporation is Chris Fulcher.

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The Honorable B. Avant Edenfield, Chief Judge of the United States District Court for the Southern District of Georgia. Chief Judge Edenfield's opinion appears at *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 752 F.Supp. 1068 (S.D.Ga.1990) (hereinafter *"Fulcher's"*).

John Caustin lives in Hampstead, North Carolina. He sells seafood for a wholesale company and owns and operates fishing boats, including the Theodora Maria and the Lady Mary.

Fulcher and Caustin had a long business relationship, going back fifteen or twenty years. Prior to 1988, the extent of the business relationship was that Cuastin often operated his vessels in the area near Fulcher's packing house, sold seafood caught on his vessels to Fulcher's Point, and purchased supplies for these vessels from Fulcher's Point. The two men trusted each other a great deal.

In February 1988, ... Caustin's boats [ ] owed Fulcher some money for supplies furnished to the boats. The Lady Mary was located in North Carolina, and the Theodora Maria was fishing in Georgia waters. Both were losing money.

Fulcher thought he could remedy the situation for Caustin, and derive some benefit of his own at the same time. At Fulcher's prompting, Caustin and Fulcher entered an informal agreement concerning the Lady Mary and the Theodora Maria. Pursuant to this casual, oral agreement, Caustin sent these boats to Fulcher's dock in Oriental, North Carolina. Fulcher agreed to provide supplies and other necessaries to the boats; and, over the course of the agreement, ... [he did just that].

In addition to providing supplies, Fulcher agreed to procure ship captains familiar with the area to handle the operation of the vessels.... Fulcher hired and fired captains without consulting Caustin.

The parties did not intend for Fulcher to share in the profits of the boat[s]. Instead, Caustin was to receive all profits from the boat[s], and Fulcher would benefit from the arrangement by the increased business at his dock. The parties never discussed who was to bear any losses from the boats because both Fulcher and Caustin assumed that the boats would make profits.

Fulcher, of course, did expect to profit from the agreement. He hoped his business would profit from packing and sell-ing catches from Caustin's boats. Furthermore, he planned to supply the boats with necessaries, including repairs, ice, and fuel, as he did to other boats [that] off-loaded at his dock.

*Fulcher's*, 752 F.Supp. at 1070 (footnote omitted).

In those respects, Fulcher treated the Caustin boats like any others at the packing house. However, the Caustin boats were markedly different from other boats in at least two significant respects. First, by virtue of the agreement between Caustin and Fulcher, Fulcher had control over the Caustin boats and thus more than a passing interest in their fishing success. Second, due to his control of the boats, Fulcher directed the kind of fishing that they would do. In particular, Fulcher converted the vessels for scallop fishing. The arrangement between Fulcher and Caustin evidences an agreement representing something greater than an ordinary packing house-fishing boat relationship. To some extent, the Caustin boats appeared to be Fulcher's boats. The district court found that "Fulcher's Point profited from the arrangement," *id.*, and further explained its effects as follows:

> The parties assumed that the fishing boats would dock at Fulcher's dock most of the time. Fulcher promised that he would oversee the captains to make sure they did not misappropriate the catches, since the parties believed misappropriation was "one thing between making it and, you know, [what they call] breaking it." Testimony of John Caustin, Transcript at 41. Fulcher may not have explicitly required captains to off-load at his dock; however, the captains ordinarily did so. On the rare occasion that the captains off-loaded at other docks, the owners of the docks usually sent the money for the catches to Chris Fulcher, not to John Caustin.... Caustin received a check from a dock owner only once.... [T]he Court finds that [the other dock owners] believed that Fulcher managed and perhaps owned the [Caustin] boats. [Whatever the appearance,

Caustin remained the true owner of the two boats throughout the agreement.]

When Fulcher received money from other dock owners, he credited the account he had for the Lady Mary or the Theodora Maria. Fulcher's Point prepared "trip tickets," sheets revealing the catches and the revenue from them, whenever one of the boats off-loaded.... [O]rdinarily, a dock owner would send the trip ticket to the boat owner immediately.... [However], Caustin did not receive any of [the tickets] until tax season.

*Id.* at 1070–71.

The evidence is unclear whether, or for how long, the Caustin boats made money while under Fulcher's control; ultimately, they appear to have been more in the way of liabilities than assets. The "Theodora Maria" ran into trouble with a bridge and needed repairs, which were largely covered by insurance that Fulcher had bought on the boat. Various other maintenance was done on both vessels (and paid for by Fulcher) while they were in his custody. Near the end of the arrangement, the "Lady Mary's" engine blew, and she was out of service until the agreement terminated and Caustin took charge of the boats. The operation of the boats was ultimately a losing enterprise.

Caustin testified that he terminated the agreement in September of 1989 and put his own captain back on the "Theodora Maria." After making some repairs of his own on the "Lady Mary," he then took her out of Fulcher's dock. Transcript at 45–47. Thereafter, Fulcher advised Caustin that nearly $50,000 was owed by the boats. Fulcher filed his claims for maritime liens, and this case has resulted. The lien in question is only as to the "Theodora Maria" because Caustin has stipulated that the lien sought against the "Lady Mary" may be transferred to the lien against the "Theodora Maria." If Caustin and Fulcher are joint venturers, no lien may be maintained, and that is the subject of our review.

## II. DISCUSSION

■ The former-fifth circuit case of *Sasportes v. M/V SOL DE COPACABANA,* 581 F.2d 1204 (5th Cir.1978), controls this one.[2] In *Sasportes,* the court discussed maritime liens and joint ventures. While the presumption in favor of a maritime lien is strong, "[j]oint venturers cannot hold maritime liens because they are not 'strangers to the vessel.'" *Id.* at 1208 (quoting *P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal,* 373 F.Supp. 267, 275 (E.D.N.Y.1974)). That is, a joint venturer does not rely on the credit of the vessel(s), but only on the credit of the co-venturer.

Specifically, the court said the following about joint ventures:

The parties' intentions are important. Joint ventures involve joint control or the joint right of control, and joint proprietary interests in the subject matter of the venture. Both venturers share in the profits, and both have a duty to share in the losses. But of course these elements cannot be applied mechanically. No one aspect of the relationship is decisive.

*Id.* (citations omitted).[3] The factors listed by the *Sasportes* court are not a checklist. They are only signposts, likely indicia, but not prerequisites.

■ We review the district court's findings as to a joint venture's existence under the clearly erroneous standard. *See Crustacean Transp. Corp. v. Atalanta Trading Corp.,* 369 F.2d 656, 660 (5th Cir. 1966) (finding of no waiver of lien (and, thus, no joint venture) will not be disturbed unless clearly erroneous). Further, we look to the whole relationship to determine whether or not the facts support the conclusion that a joint venture existed. *See*

---

**2.** The Eleventh Circuit has adopted the former-Fifth Circuit's decisions as binding precedent. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

**3.** In a case involving Florida law, *Pinnacle Port Community Ass'n, Inc. v. Orenstein,* 872 F.2d 1536, 1539 (11th Cir.1989), we named similar joint venture elements. Fulcher cites Georgia case law. We conclude that we need look no further than *Sasportes.*

*Sasportes*, 581 F.2d at 1208 ("No one aspect of the relationship is decisive.") (citation omitted).

As the district court noted in its opinion, *see Fulcher's*, 752 F.Supp. at 1073, in *Sasportes*, a joint venture did not exist between Star–Kist and the vessel owner because Star–Kist "exerted no significant control over the Copacabana [the vessel] beyond that which any creditor and contract obligee might have. [Star–Kist] did not, for example, dictate ... decisions about where to fish, whom to hire, what techniques to use, and the like." *Id.* at 1209. Further, the written contract between the parties (which required selling the catches to Star–Kist pursuant to a certain pricing arrangement) did not evidence an agreement to share in the profits, but instead was "the natural result of bargaining between a canner [Star–Kist] who wishes to ensure an adequate supply of fish at a reasonably predictable price, on the one hand, and a fishing company which wants a guaranteed market [with some flexibility]." *Id.* Looking at the whole picture, so to speak, and bearing in mind the two points above, the *Sasportes* court held that the district court had erred in finding a joint venture. *Id.*

■ In this case, however, the facts, examined as a whole, support the district court's finding that a joint venture existed between Fulcher and Caustin. Even taken separately, the *Sasportes* factors support the district court's conclusion. We start by considering the control element of this case in contrast to that of *Sasportes*. Though, like Star–Kist, Fulcher was partly looking for a "supply of fish," Caustin was not simply a fisherman looking for a "guaranteed market." Fulcher solicited Caustin and his boats with an offer of much more than a fish market, and Caustin agreed to much more. Unlike in *Sasportes*, Caustin surrendered the control of his boats to Fulcher, who then "dictate[d] ... decisions about where to fish, whom to hire, what techniques to use, and the like." *Id.* At a minimum, joint control existed under the facts of this case.

Next, we consider joint proprietary interest. This feature, too, is self-evident. Fulcher had an interest in the vessels to such an extent that he even insured one of them. Though Caustin remained the true owner of the boats, Fulcher became their "operations" manager and arguably an apparent owner. As such, we conclude he had proprietary interest in the vessels and their success.

The profit (and loss) considerations are a closer question. Fulcher was not to receive the actual profits (if any) from the boats; yet, in a sense, he did profit. The boats apparently made no profit, thus we cannot say what would have been done with any such profits. As it was, the proceeds from the catches went to pay down the debt the boats owed to Fulcher. However, the proceeds and trip ticket of only one catch went to Caustin; all the others went to Fulcher. We agree with the district court's conclusion that Fulcher, at least in this way, did "profit" from the arrangement with Caustin.

Fulcher argues two points about profit. First, Fulcher posits that without a finding that profits were to be shared there cannot be a finding of joint venture. Second, Fulcher complains that the district court's conclusion about profits incorrectly elevated the incidental profit made by Fulcher to the level of legally significant profit. We deny both propositions. Though profit-sharing is a significant factor, we consider the total circumstances of an agreement to determine its status as a joint venture, vel non. While the profits of the *vessels* were not explicitly shared under the Fulcher–Caustin agreement, the other circumstances of the arrangement suggest that profit from the *enterprise* was a motive for both parties. We agree with the district court that, in light of the strong control elements in this case, the profit consideration is less weighty than it might otherwise be. *See Fulcher's*, 752 F.Supp. at 1073.

The last singular examination we make is of intent. Fulcher argues that the district court erred by finding a joint venture without making a finding that the parties intended to create a joint venture. We dis-

agree. First, we are not convinced that a finding of intent was not made. In this case, we know little of the parties' true intentions, other than their largely self-serving testimony on that count. However, we do have their actions. We have already discussed the significant aspects of joint venture in that regard. Under the factual findings made in this case, we conclude that the district court did not err by failing to expressly find "intent" to form a joint venture.

Second, while *Sasportes* indicated that "[t]he parties' intentions are important," *Sasportes*, 581 F.2d at 1208 (citation omitted), we read *Sasportes* to suggest only that the intentions of the parties are important to reveal the nature of an agreement, but not to suggest that they are paramount in a finding of joint venture. We conclude that whatever the true intent of the parties, their conduct (and the intent thereby evidenced) created a joint venture. The district court's conclusion was not error.

We note that Fulcher has missed the mark by isolating the various facets of this case from one another. We reiterate that the factors that indicate the existence of a joint venture do not have to be met point for point. The facts of this case establish some factors (as control and proprietary interest) most resolutely, yet others (as profit sharing) are shown only vaguely if at all. Nevertheless, the whole can be greater than the sum of its parts. The facts of this case suggest to us that a joint venture was achieved. We again return to *Sasportes* to better illustrate why.

> Perhaps the best example of a joint venturer would be a party whose prospective gains resemble the owner's, who has the owner's prerogatives, and who might otherwise appear to investigating creditors to be a part owner. Such a party may, of course, have an *in personam* contract claim against the true owner. But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself.

*Id.* at 1208–09.

During his operation of the Caustin boats, Fulcher looked, thought, and acted like an owner. And while Fulcher may not have profited exactly like an owner, that only slightly contrary fact, in light of the other relevant circumstances of this case, does not alone deny that a joint venture was created—that Fulcher relied on the credit of Caustin, not his boats.

## III. CONCLUSION

Though we do not suggest it as a legal principle, some merit lies with the old saw that what looks, walks, and quacks like a duck is probably a duck. So it is true for the agreement in this case vis-a-vis joint venture. Having considered the evidence and the law as above, we hold that they demonstrate that the arrangement between Caustin and Fulcher was a joint venture. Therefore, Fulcher may not maintain a maritime lien against the vessels. The judgment of the district court is AFFIRMED.