**Sharee WINSLOW, Plaintiff,**

v.

**S/V "DANCING DOLPHIN," her engines, tackle, apparel, furniture, etc. and her dinghy "TT DANCING DOLPHIN", in rem, Defendant.**

**No. CIV.2003–94.**

District Court, Virgin Islands,
D. St. Thomas and St. John.

June 30, 2003.

Frederick G. Watts, St. Thomas, VI, for the plaintiff.

Marshall A. Bell, St. Thomas, VI, for the claimant Dancing Dolphin Watersports, Inc.

Marie E. Thomas Griffith, St. Thomas, VI, for Richard Johns.

## MEMORANDUM

BARNARD, United States Magistrate Judge.

Sharee Winslow ["Winslow"] brought this *in rem* action pursuant to Federal Rule of Civil Procedure 9(h) to assert a maritime lien arising under 46 U.S.C. § 11112 for master's wages against the vessel Dancing Dolphin and her dinghy TT Dancing Dolphin [collectively, "the vessel"]. The vessel was arrested pursuant to this Court's June 2, 2003 warrant of arrest. The vessel's owner, Dancing Dolphin Watersports Inc. ["Watersports"] seeks to have the vessel released pursuant to Rule E(4) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. On June 27, 2003, the Court held a hearing to determine whether Winslow holds a valid maritime lien for master's wages against the vessel. I find that Winslow and Watersports had effectively entered into a joint venture for the operation of the vessel. Thus, Winslow was not a stranger to the vessel and could not hold a maritime lien against it.

## I. FACTUAL BACKGROUND

S/V Dancing Dolphin is a 1995 Sea Islands 50 foot long sailing catamaran. On or about November 1, 1999, Watersports, a corporation organized under the laws of the United States Virgin Islands, purchased the vessel. On or about November 3, 1999, Winslow was designated as the president of the corporation. (Claimant's

Ex. 1.) As president, Winslow was expected to serve on occasion as the master of the vessel. At the same time as Winslow was designated president of Watersports and hired as a master of Dancing Dolphin, she was offered the opportunity to purchase fifty percent of the outstanding stock in Watersports. Winslow was unable to make the payments required by the option and thus never became an owner or part owner of Watersports.

Although Winslow had been engaged at a salary of $4,000 per month, Watersports advised Winslow that she could only be paid $2,000 per month. This arrangement was memorialized in the minutes of the January 21, 2001, Watersports Board of Directors meeting,[1] and Winslow apparently agreed to the arrangement since that was the compensation which she subsequently received. (Claimant's Ex. 2.)

## II. DISCUSSION

This is an admiralty and maritime action within the meaning of 28 U.S.C. § 1333 (1988) and Rule 9(h) of Fed.R.Civ.P.; thus, the Court has subject matter jurisdiction in this case. Furthermore, S/V Dancing Dolphin is a vessel capable of being subject to maritime liens; therefore, this Court has jurisdiction over the vessel *in rem*.

### A. Presumption of Maritime Lien

■ The issue before the Court is whether Winslow has a maritime lien

against the vessel. Federal law provides that "[t]he master of a documented vessel has the same lien against the vessel for the master's wages and the same priority as any other seaman serving on the vessel." 46 U.S.C. § 11112 (1987). Once a plaintiff establishes that she is the master of a vessel and unpaid wages are outstanding, a presumption attaches that she relied on the credit of the ship and consequently has a maritime lien.

### B. Joint Venture

Watersports claims it can overcome this presumption, however, because its arrangement with Winslow constituted a joint venture.

■ "Joint venturers cannot hold maritime liens because they are not 'strangers to the vessel,', but rather occupy a position akin to that of the vessel's owner." *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1208 (5th Cir.1978) (citing *P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal*, 373 F.Supp. 267, 275 (E.D.N.Y.1974)).

■ "A joint venture or joint enterprise exists when two or more combine their property or labor, or both, in a joint undertaking for profit with rights of mutual control, provided the arrangement does not establish a partnership." *Fulcher's Point Pride Seafood, Inc. v. M/V "Theodora Maria"*, 752 F.Supp. 1068, 1072 (S.D.Ga.1990).

---

1. The minutes of the meeting provided:
   Discussion on Sharee [Winslow]'s pay
   Rich [Difede] put up risk capital, borrowed money personally for the Corporation's benefit and personally guaranteed the Workbench debt. Sharee agreed prior to and at the start of operations that her compensation would be $2,000 per month until the Workbench was paid in full and the Corporation was producing sufficient income to meet monthly mortgage and load repayments. The Corporation has not been able to repay the short-term Workbench debt or stay current with the Johns mortgage and other loan repayments and therefore cannot afford to increase her salary. Pay is to remain at $2,000/month until such time as the Workbench is repaid in full and mortgage and loan obligations can be met monthly. Sharee may elect to resign at any time if the $2,000 per month salary is unacceptable to her. Sharee elects to remain at the current salary.

■ The *Sasportes* court described the elements of a joint venture: (1) intention of the parties to create a joint venture; (2) joint control or joint right of control; (3) joint proprietary interests in the subject matter of the venture; (4) right of both venturers to share in the profits; and (5) duty of both to share in the losses. *Sasportes* at 1208. That court added the important proviso that "of course these elements cannot be applied mechanically. No one aspect of the relationship is decisive." *Id.* I now turn to the application of these factors to the facts of the case.

### (1) Intention of the parties to create a joint venture

■ Richard A. Difede testified that it was his intention to bring Winslow in as an owner of the company. Winslow also wanted to buy in to the company. The parties reached agreement on a purchase of Watersports stock by Winslow. (Claimant's Ex. 5.) While the agreement was never consummated, it is nevertheless evidence of an intention to create a joint venture.

### (2) Joint control or joint right of control

Winslow exercised total operational control over the vessel. In particular, she controlled Watersports's checkbook and spent Watersports's funds to keep the operation running. Winslow made decisions on hiring other captains and crew. She held primary responsibility for keeping the boat full and acquiring new contracts. She was thus primarily responsible for the financial state of the enterprise. Winslow did not rely on the credit of the vessel for her income; rather, her financial situation was in her own hands. If she sought out and secured more business for Dancing Dolphin, Watersports would be more profitable. Winslow herself, not Difede or others in Watersports, exercised this responsibility and control.

### (3) Joint proprietary interests in the subject matter of the venture

Although Watersports was the true owner of the vessel, Winslow exercised control over Dancing Dolphin's day to day operations. I conclude that she had proprietary interest in the vessel and its success.

### (4) Right of both venturers to share in the profits

Winslow would have been eligible to share in the profits in two senses if the company became profitable. First, she would have been compensated above the $2,000 rate. That is, she would have received the $4,000 originally agreed upon. Second, she would have had the funds to purchase part or all of the shares of Watersports and could have become the partial or full owner of Watersports.

While the Watersports shareholder agreements did not explicitly provide for Winslow to share in corporate profits and Winslow owned no shares of Watersports, the arrangement amounted to *de facto* profit sharing. "Though profit-sharing is a significant factor, we consider the total circumstances of an agreement to determine its status as a joint venture, vel non. While the profits of the vessel[ ] were not explicitly shared under the ... agreement, the other circumstances of the arrangement suggest that profit from the *enterprise* was a motive for both parties." *Fulcher's Point Pride Seafood v. M/V "Theodora Maria"*, 935 F.2d 208, 212 (11th Cir.1991) (emphasis in original).

### (5) Duty of both to share in the losses

While Winslow was not liable for Watersports's debts, she shared in Watersports's losses in the sense that she agreed to earn less than the originally agreed-upon $4,000 per month as long as the corporation was not profitable. Winslow viewed this compensation arrangement as

generating deferred income, to be realized if and when the corporation became profitable. But she shared in the loss of the corporation in a meaningful sense.

Considering the circumstances of the case in their entirety, I find that Winslow was a joint venturer with Watersports to the extent that she is precluded from holding a maritime lien against the vessel. "[T]he factors that indicate the existence of a joint venture do not have to be met point for point. The facts of this case establish some factors (as control and proprietary interest) most resolutely, yet others (as profit sharing) are shown only vaguely if at all. Nevertheless, the whole can be greater than the sum of its parts." *Id.* at 213. I find that the facts of this case suggest that a joint venture was achieved. While Winslow did serve as the master of the vessel, her primary role was president and director of the Watersports enterprise. "[W]hen the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself." *Sasportes* at 1209.

## CONCLUSION

Because Winslow served in part as master of the vessel, a presumption arose that she had a lien on the vessel. Watersports has overcome this presumption, however, by proving that Winslow exerted significant control over the operation of the vessel and that she stood to profit from this control. This evidence is sufficient to establish that Winslow and Watersports were effectively joint venturers. As a joint venturer, Winslow is not a "stranger to the vessel," and can not hold a maritime lien against it.

The Court therefore holds that Winslow does not have a maritime lien against the vessel.

## ORDER

For the reasons enumerated in the foregoing memorandum of even date, it is hereby

**ORDERED** that the arrest of S/V "Dancing Dolphin," her engines, tackle, apparel, furniture, etc. and her dinghy "TT DANCING DOLPHIN", is VACATED. It is further

**ORDERED** that the Marshal shall release the vessel.